**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ralph E. BRANDON, Defendant– Appellant.**

**No. 97–3812.**

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1998.

Decided Oct. 23, 1998.

948

Gary D. Arbeznik, Asst. U.S. Attorney (argued), Nancy L. Kelley (briefed), Office of U.S. Attorney, Cleveland, OH, for Plaintiff–Appellee.

Gregory L. Poe (argued and briefed), Assistant Federal Public Defender's Office for District of Columbia, Washington, DC, for Defendant–Appellant.

Before: KEITH, RYAN, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Ralph E. Brandon, currently in jail awaiting trial on the criminal charge of sending a threatening letter through the mail, appeals from the district court's order denying him a judicial hearing on the issue of whether he may be forcibly medicated with antipsychotic drugs in order to render him competent to stand trial. The government asserts that Brandon's interlocutory appeal is premature and lacking in merit. For the reasons that follow, we find that appellate review is appropriate and hold that Brandon is entitled to a judicial hearing to decide whether he may be forcibly medicated. We therefore REVERSE the district court's ruling and REMAND the case for further proceedings consistent with this opinion.

### I. BACKGROUND

On October 1, 1996, Brandon was indicted on the charge of sending a threatening com-

munication to a "C. Bailey" through the mail in violation of 18 U.S.C. § 876. Brandon's attorney moved for a court-ordered competency evaluation. On November 20, 1996, the district court granted the motion and placed Brandon in the custody of the Attorney General for a psychiatric examination to determine whether Brandon was competent to stand trial. An evaluation was conducted in February of 1997 by the Federal Medical Center in Lexington, Kentucky ("FMC Lexington"). A forensic psychologist at FMC Lexington diagnosed Brandon as a paranoid schizophrenic, and concluded that he is "mentally incompetent to the extent that he is unable to understand the nature and consequences of proceedings against him or to assist properly in his defense."

On March 4, 1997, the district court held a competency hearing. Based on the psychiatric evaluation report and the agreement of counsel, the district court concluded that Brandon was not competent to stand trial. Pursuant to 18 U.S.C. § 4241(d), the district court then committed Brandon to the Federal Medical Center in Rochester, Minnesota ("FMC Rochester") for a determination of whether there was "a substantial probability that in the foreseeable future defendant will attain the capacity to permit the trial to proceed." The district court instructed the Bureau of Prison's ("BOP") hospital at FMC Rochester that it could not involuntarily administer Brandon antipsychotic medication without the approval of the district court.

On April 9, 1997, FMC Rochester sent the district court an Admission Psychiatric Evaluation Addendum ("APEA"), recommending that Brandon be given antipsychotic medication, which Brandon had refused to take. The APEA concluded as follows: "His multidisciplinary team concurs with the diagnosis of Delusional Disorder and the need for antipsychotic medication as the least restrictive alternative to restore him to competency." FMC Rochester further reminded the district court that the medication would be administered only after the hospital held an administrative hearing pursuant to 28 C.F.R. § 549.43, and upon direction from the district court.

Brandon then moved for an evidentiary hearing to determine whether the hospital could force him to take antipsychotic mediation. He further requested that a guardian *ad litem* be appointed to represent his interests if, in addition to being found incompetent to stand trial, he were found functionally incompetent. The district court denied the motion on July 18, 1997, holding that an administrative hearing conducted by the hospital on the medication issue would suffice to protect Brandon's due process rights. The district court did not address Brandon's request for the appointment of a guardian *ad litem*.

Brandon thereafter appealed from the district court's order, and filed an emergency application for a stay pending the appeal. On July 31, 1997, this court issued an order refusing to stay the district court's order to the extent that it allowed the BOP's administrative hearing to proceed, but granted a stay that prohibited the administration of antipsychotic medication without prior approval by this court.

On November 4, 1997, FMC Rochester's Warden sent a letter to the district court reporting that an administrative hearing was conducted on July 30, 1997. The hearing officer concluded that Brandon should be forcibly medicated with antipsychotic drugs.

## II. ISSUES PRESENTED

Brandon's appeal presents two issues: (1) whether the district court's order constitutes a collateral order and is thus immediately appealable under 28 U.S.C. § 1291, and (2) whether the Due Process Clause of the Fifth Amendment requires a judicial hearing to determine whether a non-dangerous pretrial detainee can be forcibly medicated in order to render him competent to stand trial.

## III. APPELLATE JURISDICTION

■ The government argues that this court lacks appellate jurisdiction because no final decision has been rendered in the court below. For the reasons that follow, we disagree. An appellate court may entertain appeals only from "final decisions." *See* 28 U.S.C. § 1291. An interlocutory order, however, may be considered a "final decision"

under § 1291 if it constitutes a "collateral order" as defined in *Cohen v. Beneficial Industrial Loan Corporation,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). To be a "final" collateral order, the order must: (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) "be effectively unreviewable on appeal from a final judgment." *United States v. Davis,* 873 F.2d 900, 908 (6th Cir. 1989) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)); *see also Digital Equipment Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 867, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994) ("The collateral order doctrine is best understood not as an exception to the 'final decision' rule ... but as a 'practical construction' of it. ...").

■ As to the first point, the government contends that the disputed issue has not been conclusively determined because the district court did not decide if antipsychotic medication should be forcibly administered to Brandon. Whether Brandon may be forcibly medicated, however, is not the issue presently on appeal. The issue to be determined is what procedural safeguards must be provided in a hearing to make that decision. The district court has conclusively decided that a BOP administrative hearing under 28 C.F.R. § 549.43 will satisfy due-process requirements and that a judicial hearing is not required. This issue has therefore been conclusively decided by the district court.

Second, the order being appealed is separate from the merits of the criminal action against Brandon for sending a threatening communication through the mail. The issue on appeal is whether a BOP administrative hearing provides sufficient due process to determine whether antipsychotic medication can be forcibly administered to Brandon in order to render him competent to stand trial.

Third, the order in question would be effectively unreviewable on appeal after a final judgment has been rendered in the criminal trial. Because the order relates to the administration of drugs in order restore Brandon's competency to stand trial, it would be of little value to Brandon for this court to

review his due-process claim after he has been forcibly medicated and the trial has concluded. *See United States v. Davis,* 93 F.3d 1286, 1289 (6th Cir.1996) ("[L]oss of liberty occasioned by the commitment for examination, and the forced intrusion of a court-ordered psychiatric examination, are completely unreviewable by the time of final judgment. Appellate review after final judgment would be available only if the defendant is found guilty, and even then, no effective relief could be provided for her loss of liberty during the period of commitment.").

We may therefore properly exercise jurisdiction over Brandon's appeal to decide whether the district court erred in holding that a BOP administrative hearing under 28 C.F.R. § 549.43 is sufficient to protect Brandon's due-process rights.

## IV. HISTORICAL DEVELOPMENT

In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court established that the presumption of innocence afforded pretrial detainees does not immunize them from reasonable restraints related to their confinement. *Id.* at 534, 99 S.Ct. 1861. Addressing the conditions affecting non-fundamental rights, the Court explained that the restraints are constitutional unless they amount to punishment. *Id.* at 536–37, 99 S.Ct. 1861.

Less than one month after *Bell* was decided, the Supreme Court issued its decision in *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), holding that Georgia's mental-health laws regarding involuntary civil commitment proceedings provided sufficient procedural safeguards for minors. *See id.* at 607, 99 S.Ct. 2493. The Court weighed the child's substantial liberty interest in avoiding unnecessary confinement against the state's *parens patriae* interest in protecting the welfare of the child. *See id.* at 604–05, 99 S.Ct. 2493; *see also* BLACK'S LAW DICTIONARY 1114 (6th ed. 1991) (" 'Parens patriae,' literally 'parent of the country,' refers traditionally to role of state as sovereign and guardian of persons under legal disability, such as juveniles or the insane."). The Court rejected the need for a judicial hearing

on what it held was essentially a medical decision. *See Parham*, 442 U.S. at 609, 99 S.Ct. 2493. The Court explained that minors are best protected when decisions regarding their best interests are reserved to medical professionals, rather than to a judge. *See id.* at 607, 99 S.Ct. 2493.

The Court reasserted its deference to medical judgment in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), holding that a mental health facility could exercise its *parens patriae* power to physically restrain an incompetent inmate, so long as the decision was made within the exercise of professional medical judgment. *See id.* at 321, 102 S.Ct. 2452.

The Tenth Circuit, in *Bee v. Greaves*, 744 F.2d 1387 (10th Cir.1984), held that the forced medication of a pretrial detainee would affect the detainee's ability to produce ideas and, therefore, affected the detainee's freedom of speech. *See id.* at 1393–94. Accordingly, the court adopted a strict-scrutiny test to decide whether a detainee may be forcibly medicated to render him competent to stand trial. *See id.* at 1395. While the court noted that Bee was eventually found competent, it questioned whether bringing him to trial could ever be a sufficiently compelling reason to medicate him against his will. *See id.*

In *United States v. Charters*, 863 F.2d 302 (4th Cir.1988) (*en banc*), the Fourth Circuit extended the "medical judgment" standard in deciding whether to forcibly medicate a dangerous pretrial detainee. The court relied on *Parham* and *Youngberg*, holding that a judicial hearing was not necessary or valuable for making the "base-line" determination, but such a hearing should be conducted to review the hospital's decision for the purpose of ensuring that it was not arbitrary. *See id.* at 313, 102 S.Ct. 2452.

In *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Supreme Court applied this deference to medical judgment in a case involving the forced medication of a dangerous convicted felon. The government's interest at stake in *Harper* was the safety conditions within the prison. *See id.* at 225, 110 S.Ct. 1028. Relying on *Parham*, the Court concluded that

such medical decisions were not aided by judicial intervention. *Id.* at 232, 110 S.Ct. 1028. The Court also applied a "rational-basis" standard of review, holding that the regulation was reasonably related to legitimate penological interests. *See id.* at 224, 110 S.Ct. 1028 (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

In *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), the Supreme Court declined to prescribe substantive standards to define when a pretrial detainee awaiting trial on murder and robbery charges may be forcibly medicated. *See id.* at 136, 112 S.Ct. 1810. The Court described *Harper* as requiring that a decision to forcibly medicate a prisoner be based on a finding of an overriding justification for and the medical appropriateness of the treatment, *see id.* at 135, 112 S.Ct. 1810, and reversed the district court's order, which allowed forced medication without considering the need for such treatment or the availability of reasonable alternatives. *See id.* at 136, 112 S.Ct. 1810. The Supreme Court went on to say, however, that such a decision would be constitutional if based on a finding that no less restrictive alternatives were available, and that such medication was necessary for either safety reasons or to obtain a proper adjudication of guilt or innocence. *See id.* at 135, 112 S.Ct. 1810.

The only case decided since *Harper* and *Riggins* that discusses whether a pretrial detainee is entitled to a judicial hearing before being medicated for the purpose of restoring competency to stand trial is *Khiem v. United States*, 612 A.2d 160 (D.C.1992). Quoting *Parham*, the *Khiem* court extended the medical-judgment rule to non-dangerous pretrial detainees, holding that "due process is not violated by the use of informal traditional medical investigative techniques." *Id.* at 173. The court did not offer any reason for this conclusion other than its understanding that *Parham* and *Harper* do not require adversarial proceedings.

## V. PROCEDURAL DUE PROCESS

■ Under BOP procedures set forth in the Code of Federal Regulations, individuals

committed to the custody of the Attorney General are given an administrative hearing before they may be forcibly medicated with "psychotropic" (antipsychotic) medication. The following procedural safeguards are provided these individuals:

1. 24–hour advance written notice of the time, date, place, and purpose of the hearing, with the reasons for the proposed medication;

2. Notice of the right to appear at the hearing, present evidence, and be represented by a staff member;

3. The hearing is to be conducted by a psychiatrist not currently involved in the diagnosis or treatment of the individual;

4. The medical professional treating or evaluating the individual must attend the hearing and present clinical data and background information in support of the need for medication;

5. The psychiatrist conducting the hearing will determine and prepare a written report regarding whether such medication is necessary in the effort of restoring the individual's competence, or because the individual is dangerous, gravely disabled, or unable to function in his housing facility;

6. Inmates are given a copy of the report and notified of their right to appeal the determination to the administrator of the mental health division in the institution within 24 hours of the decision;

7. No medication will be administered until resolution of the appeal;

8. A non-attending psychiatrist must monitor the individual's treatment at least once every 30 days and document the same; and

9. Only in emergency situations may an individual be medicated prior to a hearing; or while an appeal is pending. During an emergency, an individual may be forcibly medicated only when doing so is an "appropriate treatment" and no less restrictive means are available.

*See* 28 C.F.R. § 549.43.

Brandon claims that his constitutional due-process rights require that the forced-medication decision be made with safeguards not provided by the BOP regulation—particularly that it be made in the context of a judicial hearing. The government argues that an administrative hearing provided by § 549.43 sufficiently protects Brandon's due-process rights.

A determination of what procedural safeguards are required is a constitutional issue to be reviewed *de novo*. *See United States v. Knipp*, 963 F.2d 839, 842 (6th Cir. 1992). We must consider the following four factors: (1) the private individual's interests, (2) the government's interests, including the fiscal and administrative burdens at stake, (3) the value of the suggested procedural requirements, and (4) the risk of erroneous deprivation of the individual's rights that is inherent in current procedures. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Procedural due process rules are shaped by "the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344, 96 S.Ct. 893.

*(1) The Individual's Interests*

Brandon's interests in avoiding forced medication are several and significant. He has a First Amendment interest in avoiding forced medication, which may interfere with his ability to communicate ideas. *See Bee v. Greaves*, 744 F.2d 1387, 1393 (10th Cir.1984) ("Antipsychotic drugs have the capacity to severely and even permanently affect an individual's ability to think and communicate.").

Further, the issue of forced medication implicates Brandon's Fifth Amendment liberty interest in being free from bodily intrusion. *See Harper*, 494 U.S. at 221, 110 S.Ct. 1028 (citing *Vitek v. Jones*, 445 U.S. 480, 491–94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), and *Youngberg v. Romeo*, 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). As mentioned in *Harper*, the purpose of these medications is to alter the

chemical balance in the patient's brain in order to restore his cognitive abilities. *See id.* at 229, 110 S.Ct. 1028. Although the various drugs might have beneficial results, the concomitant side effects might be severe and irreversible. *See id.* at 230, 110 S.Ct. 1028. For example, the court in *Harper* referred to expert testimony stating that 10% to 25% of the patients taking antipsychotic medication develop tardive dyskinesia, which is characterized by uncontrollable movements of various muscles of the body and face. *See id.* Justice Stevens noted in his concurring opinion in *Harper* that the Prolixin that Walter Harper was taking was known to induce catatonic-like states, as well as drowsiness, excitement, bizarre dreams, salivation, dry mouth, blurred vision, perspiration, headaches, constipation, and impotency. *See id.* at 240, 110 S.Ct. 1028 (Stevens, J., concurring). Justice Stevens further noted that the drug may cause neuroleptic malignant syndrome, which leads to death in 30% of the people who develop it. *See id.*

Also involved is Brandon's Sixth Amendment right to a fair trial. As Justice Kennedy said in his concurring opinion in *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992): "By administering medication, the State may be creating a prejudicial negative demeanor in the defendant—making him look nervous and restless, for example, or so calm or sedated as to appear bored, cold, unfeeling, and unresponsive.... " *Id.* at 143, 112 S.Ct. 1810 (Kennedy, J., concurring). Justice Kennedy warned that the mind-altering effect of the medication may also impinge on a defendant's right to effective assistance of counsel by rendering him unable or unwilling to assist in the preparation of his own defense. *See id.* at 144, 112 S.Ct. 1810 (citing *Geders v. United States*, 425 U.S. 80, 88, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976)).

### (2) The Government's Interest

The government does not contend that Brandon is a danger to himself or others. Rather, the government's interest in this case is to render Brandon competent to stand trial in a proceeding that is fair to both parties. *See Riggins,* 504 U.S. at 143, 112

S.Ct. 1810 (Kennedy, J., concurring); *Singer v. United States,* 380 U.S. 24, 36, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) ("[T]he government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result"). If the government fails in this effort, it must dismiss the indictment and proceed with a civil-commitment hearing. *See Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (conviction of an accused, when the accused is incompetent, violates due process). No one disputes that the government's interest in bringing a defendant to trial is substantial. *See Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace").

### (3) The Value of a Judicial Hearing

In *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the Supreme Court held that procedural due process did not require a judicial hearing to decide whether it was in a child's best interests to be civilly committed. *See id.* at 618, 99 S.Ct. 2493. Writing for the Court, Chief Justice Burger explained that the questions presented in a civil-commitment hearing are essentially medical in nature, dealing with "whether the child is mentally or emotionally ill and whether he can benefit from the treatment that is provided by the state." *Id.* at 609, 99 S.Ct. 2493. The Court also warned that a judicial proceeding could harm the child's relationship with his or her parents, who are forced to serve as his adversaries. *See id.* at 610, 99 S.Ct. 2493.

The Supreme Court in *Parham* was satisfied that, in general, an independent medical decision-making process that included a thorough psychiatric investigation, followed by additional periodic review of a child's condition, was sufficiently protective of the rights of those children who should not be committed. *See id.* at 613, 99 S.Ct. 2493 (citing *Mathews v. Eldridge,* 424 U.S. 319, 344, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). The Court

stated: "[W]e do not believe the risks of error in that process would be significantly reduced by a more formal, judicial-type hearing." *Id.* Finally, the Supreme Court noted that parents are presumed to have their child's best interests in mind, and that the medical experts are in a better position to determine whether this is so than are judges and juries. *See id.* at 611–12, 99 S.Ct. 2493.

In *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Court adopted a rational-basis standard of review, *see id.* at 222, 110 S.Ct. 1028, and held that a decision to medicate a convicted felon would survive such review if the inmate was dangerous to himself or others and the treatment was in the inmate's medical interests. *See id.* at 227, 110 S.Ct. 1028. The Court held that a prison policy that required such a decision to be made at an administrative hearing satisfied procedural due process requirements. *See id.* at 233, 110 S.Ct. 1028. Writing for the Court, Justice Kennedy held that because an incompetent person's intentions are changeable and difficult to assess, a determination by a medical professional after frequent and ongoing clinical observation is preferable to a single judicial determination. *See id.* (noting Harper's own history of accepting and then refusing medication to illustrate the point). Further, Justice Kennedy adopted the reasoning in *Parham* that any fallibility in the judgment of medical professionals is not avoided by shifting the decision from those trained in medicine to one trained in law. *See id.* at 232, 110 S.Ct. 1028. The Court also noted that requiring a judicial hearing would deplete scarce prison resources, namely money and staff time, from the care of other mentally ill inmates. *See id.*

Both *Parham* and *Harper* dealt with the strictly medical issue of what treatment was in the best interests of the individuals in custody. In both cases, the treatment was held to be constitutional so long as the medical professionals considered it appropriate in the exercise of their professional judgment. But *Parham* dealt with the civil commitment of a minor and *Harper* dealt with a dangerous convicted felon. The present case, in contrast, involves a non-dangerous pretrial detainee. The decision to be made here is whether the detainee may be forcibly medicated so as to render him competent to stand trial, not whether treatment with drugs is in the detainee's medical interests. This decision will require the court to consider whether the medication will have a prejudicial effect on Brandon's physical appearance at trial, as well as whether it will interfere with his ability to aid in the preparation of his own defense.

The district court will have to make difficult legal decisions after hearing all of the medical evidence. Physicians are not equipped to determine the effect that the drugs will have on Brandon's right to a fair trial and right to counsel. Rather, the district court must understand and apply the medical recommendations of the physicians in making such decisions. The district court will benefit greatly if the FMC physicians are available for elaboration and clarification of the indications and side effects of the medication. Furthermore, the burden on the testifying physicians of attending a judicial hearing is not overbearing in light of the weightiness of the decision to be made— whether to forcibly medicate a person presumed innocent in order to restore his competency to stand trial. We therefore conclude that due process considerations require a judicial hearing on the issue presented in the case before us.

■ Having decided that such a hearing is necessary, there is little extra burden on the government to allow Brandon to present his own rebuttal testimony on the issues involved. The drawback of this approach is that it may result in a "battle of the experts," requiring the judge to evaluate potentially inconsistent medical opinions. There is no more risk of error in allowing the consideration of several medical opinions, however, than exists in totally deferring to one such opinion. In fact, it might be especially important to allow consideration of more than one medical judgment in such cases where experts are likely to disagree. In any event, judges are frequently required to decide which expert's opinion is the most persuasive.

In holding that a judicial hearing was not required, the court below relied on *United States v. Charters,* 863 F.2d 302 (4th Cir. 1988)(*en banc*). The *Charters* court addressed the government's request to forcibly medicate a dangerous and incompetent pretrial detainee in order to prevent him from causing harm to himself and others, and to render him competent to stand trial. The court adopted the reduced standard of review (rational-basis review) utilized in *Harper,* holding that Charters's freedom from bodily intrusion had to "yield to the legitimate incidents of his institutionalization." *Id.* at 306. *Charters* concluded that the decision to forcibly medicate a dangerous pretrial detainee is best reserved to medical professionals who are in the position of benign custodians. *See id.* at 311. The court's role under this approach is to review the decision to medicate to ensure it was not arbitrary and capricious. *See Charters,* 863 F.2d at 306, 313.

The present case is distinguishable from *Charters,* however, because Brandon has not been found to be dangerous to himself or others, so that the proposed treatment is not an "incident of his institutionalization." Rather, the government seeks to medicate Brandon solely for the purpose of rendering him competent to stand trial. We do not know what the Fourth Circuit would have done if the detainee in *Charters* had not posed a security risk to the institution, because the case was decided before the Supreme Court issued *Harper* and *Riggins.*

### (4) The Risks of An Administrative Hearing

As previously stated, the key decisions to be made in the present case involve nonmedical issues, such as the effect the medication will have on Brandon's right to a fair trial and his right to counsel. There is obviously great risk in allowing this determination to be made at an administrative hearing by BOP physicians who have no legal training. Given the above considerations, we find that the BOP regulation does not provide sufficient procedural safeguards for deciding whether to forcibly medicate a non-dangerous pretrial detainee. Accordingly, we conclude that such a decision requires an eviden-

tiary hearing, and remand this case so that such a proceeding may be conducted.

### VI. DETERMINATION TO BE MADE ON REMAND

#### (A) Standard of Review

Having concluded that a judicial hearing is required under these circumstances, we must determine the standard of review to be applied by the district court. Generally, due process challenges are analyzed under either a strict scrutiny or a rational basis standard. JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 10.6, at 347–48 (5th ed.1995). Government action that burdens a fundamental right will survive a substantive due process challenge only if it can survive strict scrutiny, i.e., if it is narrowly tailored to a compelling governmental interest. *See Roe v. Wade,* 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (applying strict scrutiny to infringement on fundamental right to privacy in abortion context). If the government's action does not burden a fundamental right, however, it will survive such a challenge if rationally related to a legitimate governmental interest. *See Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997) (applying the rational basis standard of review to uphold New York's statutes outlawing assisted suicide, which neither infringe fundamental rights nor involve suspect classifications).

Deciding the appropriate standard of review is crucial, because the ultimate decision in a case is often shaped by the standard applied. *See* Ashutosh Bhagwat, *Hard Cases and the (D)evolution of Constitutional Doctrine,* 30 CONN. L.REV. 961, 964 (1998) (positing that strict scrutiny has been applied so that "essentially no governmental interest sufficed to justify infringement, making strict scrutiny ... 'fatal in fact,' " and that rational basis review has been applied so that "even the flimsiest governmental justification would suffice."); *but see Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 236–37, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)(stating that strict scrutiny involves a "most searching judicial inquiry," but is not "fatal in fact" in a case involving an equal protection challenge to a federal program designed to provide

highway contracts to disadvantaged businesses), *Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)(holding that a Tennessee statute prohibiting solicitation of votes and display or distribution of campaign materials within 100 feet of entrance to a polling place was narrowly tailored to serve a compelling state interest in preventing voter intimidation and election fraud, as required by the First Amendment), and *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)(applying rational-basis review in equal protection context to strike down an amendment to Colorado's Constitution that prohibited all legislative, executive, or judicial action designed to protect homosexual persons from discrimination).

■ The proposed treatment in the present case affects a non-dangerous pretrial detainee's fundamental right to be free from bodily intrusion. *See Harper,* 494 U.S. at 221, 110 S.Ct. 1028 (citing *Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). Therefore, the government's request to forcibly medicate Brandon must be reviewed under the strict-scrutiny standard. *See Bee v. Greaves,* 744 F.2d 1387, 1395 (10th Cir.1984) (pre-*Harper* case adopting a strict-scrutiny approach in deciding whether a pretrial detainee may be forcibly medicated to make him competent to stand trial).

This standard does not conflict with *Harper*'s application of rational-basis review in its decision to forcibly medicate a *dangerous convicted felon. See Harper,* 494 U.S. at 223, 110 S.Ct. 1028. *Harper*'s rationale is based upon the premise that if the government's action focuses primarily on matters of prison administration, then the action is proper if reasonably related to a legitimate penological interest, even if it implicates fundamental rights. *Id.* (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)); *see Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. 1861 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.").

In contrast, the decision in the present case is whether to medicate a non-dangerous pretrial detainee in order to render him competent to stand trial, rather than to protect his safety or the safety of those around him while he is confined. The decision to be made here thus relates solely to *trial* administration rather than to *prison* administration. To forcibly medicate Brandon, therefore, the government must satisfy strict-scrutiny review and demonstrate that its proposed approach is narrowly tailored to a compelling interest. *See Greaves,* 744 F.2d at 1395; *Woodland v. Angus,* 820 F.Supp. 1497, 1509 (D.Utah 1993)("the reduced standard of review applied by the Court in *Harper* is not appropriate in resolving th[e] case" where the government seeks to medicate an individual in order to render him competent to stand trial); *see also Roe v. Wade,* 410 U.S. at 154, 93 S.Ct. 705.

We do not find the Supreme Court's opinion in *Riggins* determinative as to the appropriate standard of review to apply in this case. On the one hand, the Court seems to have alluded to a strict-scrutiny approach by stating:

Nevada certainly would have satisfied due process if . . . the district court had found . . . that treatment with antipsychotic medication was medically appropriate and, *considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others.*

\* \* \*

Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it *could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means.*

*Riggins,* 504 U.S. at 135, 112 S.Ct. 1810 (emphasis added); *see id.* at 156, 112 S.Ct. 1810 (Thomas, J., dissenting) ("The Court today . . . appears to adopt a standard of strict scrutiny."). On the other hand, the Court's majority opinion makes it clear that it did not set out any standard:

Contrary to the dissent's understanding, we do not "adopt a standard of strict scrutiny." . . . We have no occasion to finally prescribe such substantive standards as

mentioned above, since the District Court allowed administration of Mellaril to continue without making any determination of the need for this course or any findings about reasonable alternatives.

*Id.* at 136, 112 S.Ct. 1810.

The approach taken by other courts has varied. After carefully reviewing these decisions, we find none of them persuasive or controlling. For example, in *Khiem v. United States*, 612 A.2d 160 (D.C.1992), the court applied a balancing test to the issue of whether a non-dangerous pretrial detainee may be forcibly medicated. *See id.* at 168 (holding that the government's prosecutorial interest outweighed Khiem's interest in bodily integrity). The *Khiem* decision, which was issued two months before *Riggins,* relied on *Harper* for the proposition that the decision to be made requires that the interests of the government be weighed against those of the individual. *See Harper,* 494 U.S. at 223, 110 S.Ct. 1028. The *Harper* Court did not, however, adopt a balancing test to determine the appropriateness of the forced medication. Rather, the *Harper* Court considered the relative importance of the competing interests *only* in order to decide the proper standard of review to be applied in that case (rational-basis review). The following language in *Harper* is illuminating:

> [T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests."
>
> \*       \*       \*
>
> Our ... determination to adopt this standard of review was based upon the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration.

*Harper,* 494 U.S. at 223–24, 110 S.Ct. 1028 (citations omitted); *see* Ashutosh Bhagwat, *Hard Cases and the (D)evolution of Constitutional Doctrine,* 30 CONN. L.REV. 961, 962 (1998) (discussing the effects of transforming

strict scrutiny into an *ad hoc* balancing determination, particularly noting that such an approach, "produces a tendency ... to undermine [ ] the core of the individual liberties protected by the constitution."). We thus decline to follow *Khiem* 's application of a balancing test to a non-dangerous pretrial detainee.

The court in *Woodland v. Angus,* 820 F.Supp. 1497 (D.Utah.1993), applied a similar approach in holding that the government's interest in bringing a pretrial detainee to trial for murder did *not* outweigh the detainee's liberty interest in avoiding forced medication with antipsychotic drugs. *See id.* at 1513. The court adopted the balancing test outlined in *Winston v. Lee,* 470 U.S. 753, 767, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (holding that the government could not forcibly remove a bullet from defendant's body for the purpose of proving its case because the defendant's Fourth Amendment right to be free from unreasonable searches and seizures was not outweighed by the government's prosecutorial interest). Although the Supreme Court has determined that a balancing test is appropriate in deciding the reasonableness of a search or seizure within the Fourth Amendment context, that is not the approach is has applied under substantive due process analysis. *See Roe v. Wade,* 410 U.S. at 154, 93 S.Ct. 705.

In *State v. Odiaga,* 125 Idaho 384, 871 P.2d 801 (1994), the Idaho Supreme Court relied on *Riggins* in adopting a standard that more closely resembles strict scrutiny. The court stated as follows:

> The burden rests with the prosecution to show that medication is medically appropriate, *essential* to protect some *significant* interest, such as [the defendant's] safety or the safety of others, and that *no less [intrusive] means* of protecting that interest exists.

*Id.* at 387, 871 P.2d 801 (emphasis added). By requiring that the treatment be "essential" to protect the government's interest, the court adopted the "narrowly tailored" aspect of the strict-scrutiny standard. The court fell short, however, of requiring that the government's interest be compelling. Rath-

er, the court required that it be "significant." This is similar to the "important government interest" required under intermediate scrutiny. *See Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976)(requiring gender-based classifications by the government to be substantially related to an important government interest).

In *State v. Garcia,* 233 Conn. 44, 658 A.2d 947 (1995), the Connecticut Supreme Court adopted Idaho's approach, but added additional factors for consideration. *See id.* at 80, 658 A.2d 947. *Garcia* held that the government must prove by "clear and convincing" evidence that:

> (1) to a reasonable degree of medical certainty, involuntary medication of the defendant will render him competent to stand trial; (2) an adjudication of guilt or innocence cannot be had using *less intrusive means;* (3) the proposed treatment plan is *narrowly tailored* to minimize intrusion on the defendant's liberty and privacy interest; (4) the proposed drug regimen will not cause an *unreasonable* risk to the defendant's health; and (5) the seriousness of the alleged crime is such that the state's criminal law enforcement interest in fairly and accurately determining the defendant's guilt or innocence *overrides* the defendant's interest in self-determination.

*Id.* at 84–86, 658 A.2d 947 (emphasis added). The court vacated a medication order and remanded the case for reconsideration, noting that the government's prosecutorial interest may be considered an "overriding justification" under *Riggins. See id.* at 76, 658 A.2d 947. This approach adopts the "narrowly tailored" requirement of strict scrutiny. But the court also adopted a balancing approach by requiring that the medication not create an "unreasonable" risk of harm to a pretrial detainee, and by requiring that the seriousness of the crime "override" the defendant's interest in self-determination.

*Riggins,* however, did not adopt a balancing approach. The Court in *Riggins* stated: "Under Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of *overriding justification* and a determination of medical appropriateness." 504 U.S. at 135, 112 S.Ct. 1810 (emphasis added). Although the Court's use of the word "overriding" could be interpreted as requiring a balancing test to decide whether the government's interest "overrides" that of the individual, we do not believe this was the Court's intent. On the one hand, the *Riggins* Court did not reject the strict-scrutiny approach that is generally applied in deciding whether government action improperly infringes upon fundamental rights. *See Riggins,* 504 U.S. at 136, 112 S.Ct. 1810; *but see Planned Parenthood v. Casey,* 505 U.S. 833, 924, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)(balancing the government's interests against a pregnant woman's privacy interests in deciding whether government restrictions constitute an unconstitutional "undue burden"). On the other hand, the Court did not adopt *Harper*'s rational basis standard of review either. The Court, in fact, carefully explained that it was not actually prescribing *any* substantive standard. *See Riggins,* 504 U.S. at 136, 112 S.Ct. 1810. The Court likely intended, therefore, to simply require that the government offer reasons sufficient to override whatever level of scrutiny it decides to apply in the future. In other words, if the proper standard is to be rational-basis review, then the government will need to offer a "legitimate interest." *See Harper,* 494 U.S. at 224, 110 S.Ct. 1028. If the standard is to be strict scrutiny, then the government will have to offer a "compelling interest." *See Roe v. Wade,* 410 U.S. at 154, 93 S.Ct. 705.

■ In substantive due process analysis, a balance of rights is struck by deciding the appropriate standard of review in the first place. *See, e.g., Harper,* 494 U.S. at 223–24, 110 S.Ct. 1028. Implicit in the strict-scrutiny approach is the requirement that the government's interest be sufficiently weighty to override a fundamental right in general, without attention to the specific fundamental right implicated. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 236, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("We think that requiring strict scrutiny is the best way to ensure that courts will consistently give racial classifications that kind of detailed examination, both as to ends and as to means.").

For all of the reasons stated above, we conclude that the decision to medicate a non-dangerous pretrial detainee must survive strict scrutiny. *See Greaves,* 744 F.2d at 1395.

### (B) Determining Whether The Government's Forced Medication Decision Passes Strict Scrutiny

■ Government action subject to strict scrutiny survives only if it is narrowly tailored to a compelling governmental interest. *See Roe v. Wade,* 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The decision of whether the government's interest in medicating a pretrial detainee is compelling must be made in light of (1) whether the pretrial detainee is dangerous to himself or others, (2) the seriousness of the crime, and (3) whether the detainee will be released from confinement if not made to stand trial. *See Riggins,* 504 U.S. at 135, 112 S.Ct. 1810 ("Nevada certainly would have satisfied due process if . . . the district court had found . . . that treatment with antipsychotic medication was medically appropriate and, *considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others.*") (emphasis added); *see also Woodland v. Angus,* 820 F.Supp. 1497, 1513 (D.Utah 1993).

■ Whether the proposed treatment is narrowly tailored to this interest will turn on whether it is the least restrictive and least harmful means of satisfying the government's goal—in this case, of rendering Brandon competent to stand trial in a proceeding that is fair to both parties. *See Singer,* 380 U.S. at 36, 85 S.Ct. 783. When making this determination, the district court should engage in a two-step analysis. In the first step of the analysis, the court will receive medical testimony regarding Brandon's mental illness and its symptoms, as well as the effects that antipsychotic medication will have, both beneficial and harmful, on Brandon's physical and mental health. This step involves an analysis of Brandon's condition and treatment that is essentially *medical.*

■ In the second part of the analysis, the district court will then have to make the *legal* determination of whether Brandon, if forcibly medicated, would be competent to participate in a trial that is fair to both parties. This will require consideration of whether the medication will have a prejudicial effect on Brandon's physical appearance at trial, as well as whether it will interfere with his ability to aid in the preparation of his own defense. In particular, the district court needs to consider the risks that forced medication poses to a pretrial detainee such as Brandon, because a drug that negatively affects his demeanor in court or ability to participate in his own defense will not satisfy the government's goal of a fair trial. *See Riggins,* 504 U.S. at 143–144, 112 S.Ct. 1810 (Kennedy, J., concurring); *see also Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (conviction of an accused, when the accused is incompetent, violates due process).

This legal determination is distinct from the medical determination that the medical experts will discuss in step one of the analysis. Antipsychotic medication might sedate Brandon, making him *appear* to be lucid and rational, for example, but might not make him *in fact* lucid and rational. It is important, therefore, that the medical experts testify about the chemical and behavioral effects of the proposed medication, leaving to the district court the ultimate conclusion of whether those effects will render Brandon legally competent, i.e., whether Brandon would be able to receive a fair trial if forcibly medicated.

### (C) Burden of Proof

■ We next address the proper burden of proof to be applied in deciding whether to forcibly medicate a non-dangerous pretrial detainee. Because the burden of proof is a component of procedural due process, we must weigh the *Mathews v. Eldridge* factors outlined in Part V of this opinion. In applying these factors, we find persuasive the case of *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The Supreme Court in *Addington* held that in order to civilly commit an individual, the government is required to prove by clear and convincing evidence that the individual is mentally ill. *See* 441 U.S. at 433, 99 S.Ct. 1804. The

Court stated that the individual's interests involved in a civil commitment proceeding are greater than exist in a civil case concerning only monetary damages, but less than that present in a criminal case where an individual may face a wrongful conviction. *See id.* at 423, 99 S.Ct. 1804. The Court also explained that a higher level of proof is necessary to preserve fundamental fairness in government-initiated proceedings that threaten the individual involved with "a significant deprivation of liberty" or "stigma." *See id.* at 425–26, 99 S.Ct. 1804. The Court stated as follows:

> The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state. We conclude that the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence.

*Id.* at 427, 99 S.Ct. 1804.

We believe that the risk of error and possible harm involved in deciding whether to forcibly medicate an incompetent, non-dangerous pretrial detainee are likewise so substantial as to require the government to prove its case by clear and convincing evidence. *See id.; see also Santosky v. Kramer*, 455 U.S. 745, 757–58, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that before a state may sever completely and irrevocably the rights of parents in their natural child, due process requires that the state support its allegations by clear and convincing evidence). Given the current risks associated with the administration of antipsychotic medication, no other standard would sufficiently protect Brandon's rights.

Although the ultimate decision must be made by the district court on remand, we fully recognize the difficult burden faced by the government on this issue. But this is as it should be, given the interests at stake. The government correctly argues that it has a "significant" interest in prosecuting Brandon, rather than having to pursue civil commitment proceedings. We find it difficult to imagine, however, that the government's interest in prosecuting the charge of sending a threatening letter through the mail could be considered a *compelling* justification to forcibly medicate Brandon. This case involves no safety concerns, because Brandon has not been deemed to be dangerous. Further, the maximum penalty for sending a threatening communication is five years imprisonment. *See* 18 U.S.C. § 876. As Justice Kennedy, who authored the Court's opinion in *Harper*, wrote in *Riggins:*

> [A]bsent an extraordinary showing by the State, the Due Process Clause prohibits prosecuting officials from administering involuntary doses of antipsychotic medicines for purposes of rendering the accused competent to stand trial, and [I] express doubt that the showing can be made in most cases, given our present understanding of the properties of these drugs.

504 U.S. at 139, 112 S.Ct. 1810 (Kennedy, J., concurring). We agree with this position.

Although this higher burden of proof was rejected in *Harper*, it was done in a context inapposite to the present case. In *Harper*, the Supreme Court held that the decision to medicate a dangerous convicted felon could be made solely by medical professionals without the need for a judicial hearing. Based on that fact, the Court concluded it would make no sense to require medical professionals to convince themselves of the medical appropriateness of their own decision by clear and convincing evidence. *See Harper*, 494 U.S. at 235, 110 S.Ct. 1028. Here, however, we are dealing with a non-dangerous pretrial detainee, where a judge must conduct an evidentiary hearing on the forced-medication issue for all of the reasons previously discussed. Therefore, *Harper*'s reasoning does not apply to the facts of this case.

## VII. APPOINTMENT OF A GUARDIAN AD LITEM

The district court declined to decide whether to appoint a guardian *ad litem* for Brandon because it held that a judicial hearing was not necessary. In light of our holding that a judicial hearing is required, the district court must determine on remand

whether a guardian *ad litem* should be appointed to represent Brandon's interests.

### VIII. CONCLUSION

For all of the reasons stated above, we **REVERSE** the district court's ruling and **REMAND** the case for further proceedings consistent with this opinion. The emergency stay granted by this court against forcibly medicating Brandon shall remain in effect until the final resolution of this case.