Rabih **HADDAD**, Plaintiff,

v.

John **ASHCROFT**, et al., **Defendants**.

No. 02–70605.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 17, 2002.

Elizabeth L. Gleicher, Gleicher & Patek, Royal Oak, MI, for Plaintiff.

L. Michael Wicks, United States Attorney's Office, Detroit, MI, Terri J. Scadron, Thankful L. Vanderstar, Office of Immigration Litigation, U.S. Department of Justice, Washington, DC, for Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DENYING GOVERNMENT'S MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

EDMUNDS, District Judge.

This case arises from the Government's institution of removal proceedings against a number of non-citizens, primarily young men of Arab and Muslim background, following the horrific events of September 11, 2001, and the Government's decision to close those proceedings to the press and public. The plaintiff is Rabih Had-

dad ("Haddad"), one of the men arrested after September 11. The defendants are Attorney General John Ashcroft, Chief Immigration Judge Michael Creppy, and Immigration Judge Elizabeth Hacker (collectively "the Government"). Now before the Court is Haddad's motion for a preliminary injunction and the Government's corresponding motion to dismiss his complaint for failure to state a claim upon which relief can be granted.

## I. Factual and Procedural Background

Haddad, a native of Lebanon, resided in Ann Arbor, Michigan off-and-on since 1988.[1] *See* Haddad Mot. ¶ 4. Haddad and his family most recently came to the United States in 1998 on six-month tourist visas.[2] *See id.* Ex. A ¶ 3. On December 14, 2001, the United States Immigration and Naturalization Service ("INS") took Haddad into custody for overstaying his visa and initiated removal proceedings in Detroit before Immigration Judge Elizabeth Hacker. *See id.* ¶¶ 5 & 7.

On September 21, 2001, prior to Haddad's arrest, Chief Immigration Judge Michael Creppy issued a directive (the "Creppy directive") to all United States Immigration Judges mandating that they close immigration proceedings to the press and public (including family members of the deportee) in certain "special interest" cases identified by the Office of the Chief Immigration Judge. *See* Haddad Mot. ¶ 6. Chief Immigration Judge Creppy issued this directive under United States Attorney General John Ashcroft's authorization. *See id.* ¶ 8.

On December 19, 2002, Immigration Judge Hacker conducted a bond hearing in

---

1. Haddad resided in Ann Arbor with his wife and their four children, one of whom was born in the United States (and is therefore a citizen). *See* Haddad Mot. ¶ 9.

2. Haddad and his family have applied with the Immigration and Naturalization Service

("INS") for extensions of their visas. *See* Haddad Mot.Ex. A ¶ 3. On April 30, 2001, Haddad also applied for alien labor certification, in order to adjust his status to permanent residency. *See id.*

Haddad's case. *See* Haddad Mot. ¶ 16. Haddad's family and members of the public and press sought to attend the hearing. *See id.* Shortly before the hearing began, however, and without prior notice to Haddad or his counsel, courtroom security officers announced that the hearing was closed to the press and public. *See id.* Haddad objected to the closure of his hearing. *See id.* ¶ 18. Immigration Judge Hacker stated that the decision to close the proceedings came from her supervisors and that she lacked the power to reverse the decision. *See id.* Following the December 19 hearing, Judge Hacker denied bail and ordered Haddad detained. *See id.* ¶ 22.

Arguing that the closure of Haddad's hearings is unconstitutional, Haddad and members of the press and public (collectively the "Newspaper Plaintiffs") filed three separate cases seeking an injunction against such procedure in any future hearings.[3] *See Detroit Free Press, Inc., et al. v. John Ashcroft, et al.,* Case No. 02–70339; *Detroit News, Inc., et al. v. John Ashcroft, et al.,* Case No. 02–70340. Haddad claims that the Government's actions violate his rights under (1) the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.;* (2) the Immigration and Nationality Act ("INA"), as amended, 8 U.S.C. § 1229a, and the regulations promulgated thereunder, 8 C.F.R. §§ 3.27 & 240.10; and (3) the Due Process Clause of the Fifth Amendment of the United States Constitution. The Newspaper Plaintiffs

claimed that they have a right of access to such immigration hearings in general and to Haddad's hearings in particular pursuant to the First Amendment of the United States Constitution, as well as statutory and regulatory law. Arguing that this Court lacks jurisdiction and that no constitutional rights are abridged by the exclusion of the press and public from the hearings, the Government filed motions asking that the cases be dismissed, or, in the alternative that the Court apply a deferential level of scrutiny to the Government's action.

On April 3, 2002, the Court issued an order denying the Government's motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. On the same day, the Court issued an order granting the Newspaper Plaintiffs' motion for preliminary injunction. *See Detroit Free Press v. Ashcroft,* 195 F.Supp.2d. 937 (E.D.Mich.2002). The Court held that the Government's blanket closure of removal hearings in "special interest" cases is unconstitutional because it infringes the press' and public's First Amendment right of access to removal proceedings and the Government was unable to demonstrate interests sufficient to justify its closure of Haddad's case.[4] The Sixth Circuit Court of Appeals affirmed the Court's order on August 26, 2002. *See Detroit Free Press v. Ashcroft,* 303 F.3d 681 (6th Cir.2002).

In the interim, pursuant to this Court's order, the Government opened Haddad's proceedings to the press and public.[5]

3. The Court issued an Order on March 5, 2002, consolidating the Newspaper Plaintiffs' lawsuits. In the same Order, the Court consolidated Haddad's and the Newspaper Plaintiffs' cases for pretrial matters.

4. The Court acknowledged, however, "that there may be cases in which the Government can demonstrate interests sufficient to justify closure (provided closure is the most narrowly tailored means for protecting the interests

asserted)." *See* April 3, 2002 Order Granting Pls.' Mot. for Prel.Inj. at 15 n. 9, Case No. 02–70339.

5. On April 10, 2002, after the Government timely filed its notice of appeal, the Sixth Circuit temporarily stayed the Court's order. On April 18, 2002, the court of appeals dissolved the temporary stay and denied the

Haddad contends, however, that his continued detention violates his Due Process rights because the initial detention hearing over eight months ago was not open to the press and public.[6] Haddad also argues that the Government's classification of his case as a "special interest" matter tainted the immigration judge presiding over his removal hearings. Thus Haddad seeks a new detention hearing, which is open to the press and public and which is conducted by a new immigration judge. For the same reason, Haddad requests that a different immigration judge preside over any other hearing in his case.

## II. Applicable Law and Analysis

To determine whether to grant a motion for preliminary injunction, a court must analyze the following four factors:

(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Bonnell v. Lorenzo,* 241 F.3d 800, 809 (6th Cir.2001). The primary issue in this case, and on which the parties focus their pleadings, is whether Haddad has a strong like-

lihood of success on the merits. For the reasons discussed below, resolution of this issue turns on whether Haddad has a Due Process right to an open hearing.

### A. Whether Haddad has a strong likelihood of success on the merits

■ Haddad argues that he is likely to succeed on the merits because the Government's closure of his deportation proceedings (1) violates the Due Process Clause of the Fifth Amendment; (2) violates INS regulations; and (3) violates the APA, to the extent that the Creppy directive is viewed as amending the governing regulations. The Court finds that Haddad does not have a strong likelihood of demonstrating that the Creppy directive violates INS regulations or the APA.[7] The Court concludes, however, that Haddad has a strong likelihood of succeeding on his Due Process claim.

It is well established that aliens subject to deportation are entitled to the due process protections afforded by the Fifth Amendment of the United States Constitution. *See Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 2500–01, 150 L.Ed.2d 653 (2001) (citations omitted). As Justice Breyer wrote for the majority in *Zadvydas:* "the Due Process Clause applies to all 'persons' within the United States, in-

---

Government's motion for stay pending the appeal.

**6.** Since this Court ordered the Government to open Haddad's immigration proceedings, Judge Hacker has heard at least one motion Haddad filed asking the court to reconsider her decision to detain him. That hearing was open to the press and public. Judge Hacker denied Haddad's motion, finding that Haddad presented insufficient evidence to support a change in circumstances to justify his release on bond. Other hearings, including the removal hearing previously scheduled for August 27, have been continued by the immigration judge sua sponte or at the Government's request.

**7.** Although the Creppy directive appears to be a final agency rule generally requiring adherence to the APA's notice-and-comment procedures, the Court believes that the "foreign policy" exception set forth in 5 U.S.C. § 553(a)(1) applies to exempt it from those requirements. *See Yassini v. Crosland,* 618 F.2d 1356, 1360 (9th Cir.1980) (finding that the foreign policy exception applied to INS Acting Commissioner's directive which he issued after consulting with the Attorney General or President and which was designed to further the President's foreign policy agenda).

cluding aliens, whether their presence here is unlawful, temporary, or permanent." *Id.* In comparison, the Fifth Amendment's protections do not extend to aliens outside our geographic borders (even if they were once inside but have left). *Id.* (citing *United States v. Verdugo–Urquidez,* 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)).

While the Due Process Clause protects an alien subject to deportation, the nature of that protection may vary depending upon status and circumstance. *Id.* at 2501 (citing *Landon v. Plasencia,* 459 U.S. 21, 32–34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)). Clearly an alien is entitled to notice and a "meaningful opportunity to be heard," as these are the basic requirements of due process. *See Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (holding that "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and the opportunity to meet it.' ") To determine whether additional procedural protections are required, the Court must balance four factors: (1) the plaintiff's interest; (2) the government's interest; (3) the probable value of additional or substitute procedures; and (4) the extent of the risk of erroneous deprivations of the plaintiff's interests. *See Landon,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21; *United States v. Brandon,* 158 F.3d 947, 953 (6th Cir.1998).

Courts have found that an open hearing is fundamental to guarantee a fair hearing. *See, e.g., Fitzgerald v. Hampton,* 467 F.2d 755 (D.C.Cir.1972) (finding that due process required open and public removal hearing before Civil Service Commission); *Pechter v. Lyons,* 441 F.Supp. 115 (S.D.N.Y.1977) (finding that immigration judge abused his discretion in excluding public from immigration deportation proceeding). Thus long-standing INS regulations have required immigration judges to hold deportation hearings open to the public, except under certain circumstances.[8] *See* 8 C.F.R. §§ 3.27 & 240.10. In finding that hearings at the administrative level should be open, the D.C. Circuit Court of Appeals stated,

'A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.' That we regard an 'open and public hearing' to be a fundamental principle of fair play inherent in our judicial process cannot be seriously challenged. The Sixth Amendment requires a public trial in all criminal cases. Rule 77(b) of the Federal Rules of Civil Procedure requires that '[a]ll trials upon the merits shall be conducted in open court ...' And in administrative hearings, the rule of the "open" forum is prevailing—if not by statutory mandate, then by regulation or practice.

*Fitzgerald,* 467 F.2d at 764 (internal citations omitted).

Haddad's interest in a fair hearing before an impartial decision maker weighs heavily in favor of an open hearing in this case. As the issues to be addressed are whether Haddad should be detained in prison pending a final removal hearing and whether he ultimately should be removed from this country, there can be no doubt that the risks to Haddad of an erroneous decision based on fear or stereotype rather than the evidence presented are great. As

---

**8.** The Government correctly points out that Congress has never legislated a right to a public removal hearing; however, Congress may have found it unnecessary to legislate such a right in light of the fact that the INS' regulations traditionally required such hearings to be open.

the Sixth Circuit explained in the Newspaper Plaintiffs' case:

A deportation proceeding, although administrative, is an adversarial, adjudicative process, designed to expel non-citizens from this country. "[T]he ultimate individual stake in these proceedings is the same as or greater than in criminal or civil actions." *See N. Jersey Media Group, Inc. v. Ashcroft,* 205 F.Supp.2d 288, 301 (D.N.J.2002). "[D]eportation can be the equivalent of banishment or exile," *Delgadillo v. Carmichael,* 332 U.S. 388, 391, 68 S.Ct. 10, 92 L.Ed. 17 (1947), and the Court has taken note of the "drastic deprivations that may follow when a resident of this country is compelled by our [g]overnment to forsake all the bonds formed here and go to a foreign land when he often [may] have no contemporary identification." *Woodby v. INS,* 385 U.S. 276, 285, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). Moreover, "[t]hough deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges,* 326 U.S. at 154, 65 S.Ct. 1443. As such, "[t]hat deportation is a penalty—at times a most serious one—cannot be doubted." *Id.* at 154, 65 S.Ct. 1443.

*Detroit Free Press v. Ashcroft,* 303 F.3d 681 (6th Cir.2002).

Adherence to the rule of the open forum is especially important in cases such as this one—where our nation's borders recently have been invaded and, as a result, our citizens feel threatened. Few could disagree that the events of September 11 altered the way we view our world and the safety of our nation. Since that dreadful day, we regard our own neighbors with suspicion and go about our day-to-day affairs wary of our own security.

Traditionally in such a climate, individuals (including some in government) are more willing to abridge the constitutional rights of people who are perceived to share something in common with the "enemy," either because of their race, ethnicity, or beliefs. It is highly likely in the climate of fear the events of 9/11 precipitated, that the Government's designation of Haddad's case as a matter of "special interest" tainted the immigration judge's decision whether to release Haddad into the general public. This classification inevitably suggested a link between Haddad and terrorists or terrorism or, more specifically, the attacks of September 11. Presence of the public and press at Haddad's detention and removal hearings, therefore, helps to assure that the immigration judge bases his or her opinion on the evidence presented, rather than on unsupported allegations or fears.

With respect to the second factor set forth in *Landon*—that is, the Government's interest—the Sixth Circuit found in the Newspaper Plaintiffs' case that the Government cited a compelling interest to justify closure. *See Detroit Free Press v. John Ashcroft,* 303 F.3d 681. But while the Government's ongoing anti-terrorism investigation may implicate a compelling interest, the Creppy directive is not narrowly tailored and it does not require particularized findings. *Id.* As the court of appeals concluded:

The Creppy directive is under-inclusive by permitting the disclosure of sensitive information while at the same time drastically restricting [Constitutional] rights. The directive is over-inclusive by categorically and completely closing all special interest hearings without demonstrating, beyond speculation, that such a closure is absolutely necessary.

*Id.* at 710.

The Government has failed to make a particularized showing that its interests in fighting terrorism are implicated in Had-

dad's case. As the Government recently admitted, there in fact has been no information disclosed in Haddad's case thus far that threatened "national security or the safety of the American people." *See id.* (citing U.S. Dept. of Justice, *Statement of Associate Attorney General Jay Stephens Regarding the Sixth Circuit Decision in the Haddad Case,* (last modified 8/20/02)) <http:// www.usdoj.gov/opa/pr/2002/ April/ 02—ag—238.htm>. Thus the Court concludes in this case that this second factor does not weigh against the application of additional procedures to protect Haddad's interest in fair detention and removal hearings.

## B. Other Factors for Determining Whether the Court Should Issue an Injunction

■ Having found that Haddad possesses a Due Process right to an open hearing before an unbiased immigration judge, the Court also finds that he will suffer irreparable injury if he is not granted any relief, either release from detention or a new detention hearing that is open to the press and public and which is held before a judge not tainted by the Government's designation of his case as a "special interest" matter. This injury cannot be corrected at some later time, as it is compounded each day that Haddad is detained in violation of his constitutional rights. The Government fails to identify how issuance of the requested injunction would cause substantial harm to others. Nor has the Government set forth how the relief requested would realistically impose any hardship on it.[9] And finally, opening Haddad's hearings serves the public's interests in a number of ways. As the Court noted

in its order granting the Newspaper Plaintiffs' motion for preliminary injunction:

It is important for the public, particularly individuals who feel that they are being targeted by the Government as a result of the terrorist attacks of September 11, to know that even during these sensitive times the Government is adhering to immigration procedures and respecting individuals' rights. Openness is necessary for the public to maintain confidence in the value and soundness of the Government's actions, as secrecy only breeds suspicion as to why the Government is proceeding against Haddad and aliens like him. And if in fact the Government determines that Haddad is connected to terrorist activity or organizations, a decision made openly concerning his deportation may assure the public that justice has been done.

*Detroit Free Press v. Ashcroft,* 195 F.Supp.2d. at 944. As the Sixth Circuit cautioned, "democracies die behind closed door." An open detention and removal hearing will assure the public that the Government itself is honoring the very democratic principles that the terrorists who committed the atrocities of 9/11 sought to destroy.

Accordingly, being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Haddad's motion for preliminary injunction is **Granted;**

Within ten days of this order, the Government must either release Haddad from detention or hold a new detention hearing that is open to the press and public, before a different immigration judge;

---

9. Obviously the Government still may request that the immigration judge close the hearing if it wishes to introduce classified information or request that the information be sealed. And the immigration judge may do so after

making a particularized determination that such closure is necessary to further a compelling interest. *See* 8 C.F.R. §§ 3.27 & 240.10(b).

The Government's motion to dismiss complaint for failure to state a claim upon which relief can be granted is **Denied.**