**UNITED STATES of America**

v.

**Russell Eugene WESTON, Jr., Defendant.**

**No. CRIM. A. 98–357(EGS).**

United States District Court, District of Columbia.

March 6, 2001.

---

Ronald L. Walutes, Jr., U.S. Attorney's Office, Civil Division, Washington, DC, for Plaintiff.

A. J. Kramer, Gregory Lawrence Poe, Federal Public Defender for D.C., Washington, DC, for Defendant.

## MEMORANDUM OPINION & ORDER

SULLIVAN, District Judge.

### INTRODUCTION

This case is on remand from the United States Court of Appeals for the District of Columbia Circuit. The government advances two justifications for treating defendant, Russell Eugene Weston, Jr., involuntarily with antipsychotic medication. First, the government maintains that such treatment is medically appropriate and essential to render Weston non-dangerous based on medical/safety concerns, considering less intrusive means. Second, the government contends that this treatment is medically appropriate and essential to restore Weston's competency to stand trial because it cannot obtain an adjudication of his guilt or innocence using less intrusive means. Weston's attorneys' contend that the treatment is not medically appropriate because it will not restore Weston's competency and is unethical, that Weston is not dangerous, and that his trial rights will be unduly prejudiced, if medicated. Upon consideration of the government's justifications, the opposition thereto, the potential impact of antipsychotic medication on Weston's trial rights, relevant statutory and case law, the record of proceedings, evidence, and arguments of counsel at the numerous judicial oversight/evidentiary hearings, the Court authorizes the Bureau of Prisons ("BOP") to treat Weston involuntarily with antipsychotic medication.

## BACKGROUND

Weston is charged in a six-count federal indictment with the premeditated murders of United States Capitol Police Officers Jacob J. Chestnut and John M. Gibson, while they were engaged in their official duties as federal law enforcement officers; one count of attempted murder of United States Capitol Police Officer Douglas B. McMillan, while he was engaged in his official duties as a federal law enforcement officer; one count of carrying and using a firearm during and in relation to a crime of violence; and two counts of carrying and using a firearm during and in relation to a crime of violence and causing a death thereby. Although the Court will not repeat the extensive procedural history of this case, a detailed account of which is found in *United States v. Weston*, 69 F.Supp.2d 99 (D.D.C.1999), the key facts are as follows.

On October 15, 1998, after a joint request by the government and Weston's attorneys, the Court appointed Dr. Sally C. Johnson,[1] pursuant to 18 U.S.C. § 4241(b), to conduct an inpatient psychiatric examination of Weston to assist the Court in determining Weston's competency to stand trial. Dr. Johnson examined Weston and concluded that he was not competent to stand trial. On April 22, 1999, the Court found Weston not competent to proceed to trial, pursuant to 18 U.S.C. § 4241(d). The Court committed Weston to the custody of the Attorney General for hospitalization and treatment to determine whether a substantial probability existed that he would attain the ca-

pacity to permit the trial to proceed in the foreseeable future. At Weston's attorneys' request, the Court stayed any action by the BOP to medicate him without his consent and ordered the BOP to provide his attorneys with notice of any administrative hearing.

Weston was admitted to Federal Correctional Institute at Butner ("FCI–Butner") on May 5, 1999. On May 20, 1999, Dr. Johnson, his treating psychiatrist, requested a court order to treat Weston with antipsychotic medication. According to Dr. Johnson, Weston refused to consent to the proposed treatment, triggering an administrative hearing. *See* 28 C.F.R. § 549.43 *et seq.* The hearing officer determined that Weston could be treated involuntarily with antipsychotic medication for the following reasons: (1) he suffers from a mental disorder; (2) he is dangerous to himself and others; (3) he is gravely disabled; (4) he is unable to function in the open mental health population; (5) he needs to be rendered competent for trial; (6) he is mentally ill; and (7) medication is necessary to treat his mental illness. Weston appealed the hearing officer's decision, and the Warden affirmed.

After the first administrative hearing, the Court exercised its judicial oversight responsibility and conducted a judicial hearing, on May 28, 1999, to review the decision to medicate Weston. The Court remanded the decision to the BOP for further proceedings due to the Court's concerns that the BOP had not precisely followed the Court's April 22, 1999 Order and fully complied with the procedures for

1. Dr. Johnson was qualified as an expert in the field of forensic psychiatry, and more particularly, in the area of the treatment and restoration of patients with paranoid schizophrenia with delusions. Dr. Johnson is a psychiatrist and Captain in the United States Public Health Service where she has been employed for approximately twenty-one years.

She is the Associate Warden for Mental Services at Federal Correctional Institute at Butner where she has worked for twenty-one years. Dr. Johnson holds teaching positions at the School of Law and the Medical Center at Duke University and also at the University of North Carolina. She is board certified in psychiatry and forensic psychiatry.

the administrative hearing. *See United States v. Weston*, 55 F.Supp.2d 23 (D.D.C. 1999).

On remand, a staff representative presented evidence to support Weston's position. He advanced arguments provided to him by Weston's attorneys and presented a report by Weston's expert witness, Raquel E. Gur, MD., Ph.D., Professor and Director of Neuropsychiatry at the University of Pennsylvania. After the second hearing, the hearing officer again determined that Weston could be medicated involuntarily for the identical reasons articulated at the first hearing. Weston again appealed the hearing officer's decision, and the Warden again affirmed.

On August 20, 1999, the Court held a second judicial oversight/evidentiary hearing to review the second decision to medicate Weston. Dr. Johnson testified and, pursuant to Weston's attorneys' request, the Court admitted Dr. Gur's written comments into the evidentiary record. The Court upheld the BOP's decision to medicate Weston. *See Weston*, 69 F.Supp.2d at 118.

Weston appealed the decision and the D.C. Circuit remanded the case for further consideration. *See United States v. Weston*, 206 F.3d 9 (D.C.Cir.2000) (per curiam). Accordingly, the Court conducted a four-day hearing in July 2000, during which the government advanced two justifications for medicating Weston: (1) to render him non-dangerous and (2) to render him competent for trial. Dr. Johnson and the following additional government expert witnesses in forensic psychiatry, forensic psychology, and medical ethics testified: Dr. Deborah DePrato,[2] Dr. Howard Zonana,[3] and Dr. Edward Landis.[4] The defense presented Professor Maxwell

2. Dr. DePrato was qualified as an expert in the field of forensic psychiatry. Dr. DePrato is an Assistant Professor of Psychiatry and Public Health, and Medical Ethics at the Louisiana State University. She is board certified in adult psychiatry and forensic psychiatry and board eligible in child psychiatry. She is the administrator for the Louisiana 24th Judicial Court Clinic where approximately 250 competency to stand trial examinations are conducted each year. She personally conducts or supervises at least 200 cases a year. Dr. DePrato is a member of the Ethics Committee for the American Academy of Psychiatry and the Law at the national level and has also been appointed as a member of the Ethics Committee Louisiana Psychiatric Medical Association.

3. Dr. Zonana was qualified as an expert in the fields of forensic psychiatry and medical ethics. Dr. Zonana is a Professor of Psychiatry at Yale University School of Medicine and an Adjunct Clinical Professor at Yale Law School. He has been teaching at Yale University School of Medicine since 1968 and at Yale Law School since 1982. Dr. Zonana is a member of the Council on Psychiatry and Law and also is a member of the Commission on Judicial Action of the American Psychiatric Association. He is an original member of the American Academy of Psychiatry and Law and participated in establishing the ethical guidelines generated by that organization. He currently heads a forensic psychiatry program at Yale Medical School and previously was the medical director for the entire mental health center.

4. Dr. Landis was qualified as an expert in the field of forensic psychology. Dr. Landis is currently the Director of Psychology Training at FCI–Butner. He has worked at FCI–Butner since 1986 in a number of capacities. Dr. Landis is a licensed psychologist. He received his Master's Degree and Ph.D. from the University of Louisville and completed an internship jointly sponsored by the University of North Carolina School of Medicine and the Bureau of Prisons. He is a member of the American Psychological Association and is a Fellow of the American Academy of Forensic Psychology. He has a diploma in forensic psychology from the American Board of Professional Psychology. Dr. Landis is also an Assistant Professor of Psychiatry and Psychology at the University of North Carolina School of Medicine.

Gregg Bloche.[5] Fact witnesses, including those with day-to-day treatment responsibility for Weston, also testified.

For the following reasons, the Court determined that it was in Weston's best interest to appoint an independent mental health expert, pursuant to Fed.R.Evid. 706. First, several witnesses testified regarding a potential ethical conflict arising from Dr. Johnson's three roles in this case as the forensic evaluator on the issue of competency, an expert witness for the government, and Weston's treating psychiatrist. They opined that the treating and forensic roles should be kept separate.[6] *See* Hearing Transcript ("Tr.") 7/25/00

P.M. at 67–69; 7/26/00 P.M. Tr. at 29–34, 67, 70. Second, Weston's attorneys maintained that a conflict of interest could occur because Weston's medical and legal interests may conflict. Accordingly, they requested the Court to appoint a separate individual to represent Weston's medical interests.[7] Finally, the Court had concerns about Weston's competency to make medical decisions.

The Court appointed Dr. David Daniel,[8] "for the purpose of providing the Court with an expert opinion as to whether it is in the defendant's medical interests to administer antipsychotic medication without

5. Professor Bloche was qualified as an expert in the field of medical ethics. Professor Bloche is a Professor of Legal Ethics at Georgetown University Law Center and an Adjunct Professor of Public Health at John Hopkins University. Professor Bloche graduated from both the law and medical schools at Yale University. He treated hundreds of paranoid schizophrenic patients from 1984 to 1989 while practicing as a licensed medical doctor. He is not currently licensed to practice law or medicine and he has not practiced medicine since 1989. Professor Bloche is a policy consultant to organizations, including the National Institute of Health and the World Health Organization.

6. The potential conflict surrounding Dr. Johnson's dual role as Weston's forensic evaluator and treating psychiatrist has not yet developed, since, to date, no treatment relationship has arisen between Weston and any psychiatrist. Such a conflict can be prevented by bifurcating the roles of evaluator and treating psychiatrist.

7. Specifically, after Dr. Johnson informed the Court that she no longer considered Weston competent to make medical decisions, Weston's attorneys renewed their request for the Court to appoint a guardian *ad litem* to represent his medical interests. The parties pointed to no authority in federal criminal jurisprudence for the appointment of a guardian *ad litem* under the circumstances presented; therefore, the Court denied Weston's attorneys' request for a guardian *ad litem*.

8. Dr. Daniel graduated Phi Beta Kappa Magna Cum Laude in political science from Emory University. He attained his medical school and psychiatric residency training at Vanderbilt University where he served as chief resident. He is a diplomat of the National Board of Psychiatry and Neurology. He completed five years of advanced training in schizophrenia and psychopharmacology research within the intramural research program of the National Institute of Mental Health (NIMH). He served two years as the Medical Director of NIMH Neuropsychiatric Research Hospital. He was the founder and president of Washington Clinical Research Center (WCRC), a national leader in the conduct of inpatient clinical trials in schizophrenia. Dr. Daniel has been granted patent protection for psychopharmacological treatment advances developed at WCRC. After WCRC was acquired by Clinical Studies, Ltd., a leading multi-center clinical trials company, Dr. Daniel served as Vice President of Medical and Scientific Development at the corporate level, as well as Senior Director of all activities in the Washington, D.C. area. He has published numerous scientific papers addressing the pathophysiology and treatment of schizophrenia and has contributed to textbooks, such as the Comprehensive Textbook of Psychiatry and the Textbook of Neuropsychiatry. He is a Clinical Professor of Psychiatry and Behavioral Science at George Washington University.

his consent."[9] *United States v. Weston*, No. 98–357, August 23, 2000 Order (D.D.C.). On November 6, 2000, Dr. Daniel filed a comprehensive report with the Court and served it on the parties. On November 15, 2000, the Court held another evidentiary hearing at which the parties and the Court extensively examined Dr. Daniel. The Court admitted Dr. Daniel's report into evidence, and it is incorporated in this Opinion as if set forth *seriatim.*

## DISCUSSION

■ Weston possesses a significant liberty interest in avoiding unwanted antipsychotic medication protected by the substantive component of the Due Process Clause of the Fifth Amendment. *See Riggins v. Nevada, 504 U.S. 127,* 134, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992); *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). In *Harper,* the Supreme Court held that a convicted inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Harper,* 494 U.S. at 221, 110 S.Ct. 1028 (*citing Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Parham v. J.R.,* 442 U.S. 584, 600–01, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)).[10] A pretrial

detainee's liberty interests are at least equal to that of a convicted prisoner. *See Riggins,* 504 U.S. at 135, 112 S.Ct. 1810; *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

In *Riggins,* the Supreme Court stated:

Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means.

*Riggins,* 504 U.S. at 135, 112 S.Ct. 1810 (internal citations omitted).

■ The D.C. Circuit did not prescribe a substantive standard for this Court's review "preferring instead to await the [Court's] findings on remand using the guidance that *Riggins* provides." *Weston,* 206 F.3d at 12–13.[11] Accordingly, the

---

9. Although the Court afforded counsel an opportunity to agree on a candidate for appointment by the Court, they were unable to do so. Thereafter, the Court undertook its own search for a qualified expert and entertained objections by counsel to a number of mental health experts.

10. *Harper* involved a convicted inmate who refused to take antipsychotic medication. The Supreme Court held that the government may deprive a convicted inmate of his fundamental liberty interest in avoiding involuntary medication, so long as the deprivation is "reasonably related to legitimate penological in-

terests." *Harper,* 494 U.S. at 223, 110 S.Ct. 1028 (internal citations omitted).

11. Courts have applied different standards to review the decision to medicate dangerous and non-dangerous defendants. In *United States v. Charters,* 863 F.2d 302, 308 (4th Cir.1988), a pre-*Riggins* decision, the Fourth Circuit held that judicial review of a doctor's decision to forcibly medicate a pretrial detainee to prevent dangerousness and restore competency for trial was only available to guard against arbitrariness. Likewise, in *United States v. Morgan,* No. 98–00428, February 9, 1999 Order (D.S.C.) *rev'd on other grounds,* 193 F.3d 252 (1999), the District Court of

Court applied the *Riggins* guidance to address both of the government's justifications for treating Weston involuntarily with antipsychotic medication. The government bears the burden of proof on these issues by clear and convincing evidence.[12] *See Riggins*, 504 U.S. at 135, 112 S.Ct. 1810 (*citing Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)); *Brandon*, 158 F.3d at 960.

■ On remand, the government contends that the Court should allow it to treat Weston involuntarily with antipsychotic medication because it is medically appropriate and necessary to attain two essential government interests: to render him non-dangerous for medical/safety concerns and to render him competent to stand trial. Therefore, the Court first analyzed whether antipsychotic treatment is medically appropriate, including whether treatment violates medical ethics. The Court concludes treatment with antipsychotic medication is medically appropriate to treat Weston's illness. Second, the Court analyzed each interest the government advances: treating Weston's dangerousness and making him competent for trial. The Court concludes that each interest is compelling and either will support the proposed treatment, in light of less intrusive alternatives. Third, the Court analyzed the potential impact of involuntary medication on Weston's fair trial rights. At this stage of the proceedings, the Court concludes that while involuntary medication may impact these rights if Weston is tried, they will not be so affected as to prevent him from receiving a fair trial.

## I. The Proposed Treatment is Medically Appropriate

Weston is a diagnosed paranoid schizophrenic. The parties do not dispute that treatment with antipsychotic medication is the only therapeutic intervention that may address Weston's symptoms, lessen his delusions, and make him competent to stand trial. They do dispute whether antipsychotic medication is medically appropriate

South Carolina applied an arbitrary and capricious standard of review to a doctor's decision to forcibly medicate a pretrial detainee to prevent dangerousness and restore competency for trial. *See also United States v. Keeven*, 115 F.Supp.2d 1132, 1137 (E.D.Mo.2000) (reviewing a decision to forcibly medicate a pretrial detainee on dangerousness grounds for arbitrariness).

In *United States v. Brandon*, 158 F.3d 947 (6th Cir.1998), the Sixth Circuit addressed the question of whether a non-dangerous pretrial detainee could be forcibly medicated to restore competency for trial. The *Brandon* Court held that the issue "relates solely to trial administration rather than to prison administration. To forcibly medicate Brandon, therefore, the government must satisfy strict-scrutiny review and demonstrate that its proposed approach is narrowly tailored to a compelling interest." *Id.* at 957. *Brandon* is distinguishable from *Charters, Morgan,* and *Keeven* because Brandon was not found to be dangerous to himself or others. *See also Bee*

*v. Greaves*, 744 F.2d 1387 (10th Cir.1984) (adopting strict-scrutiny review to determine whether a pretrial detainee may be forcibly medicated to render him competent to stand trial). However, the court in *United States v. Sanchez–Hurtado*, 90 F.Supp.2d 1049, 1055 (S.D.Ca.1999), concluded that the strict-scrutiny review in *Brandon* is "contrary to the majority opinion in *Riggins.*" The court indicated that *Riggins* should guide a determination as to whether the government can involuntarily medicate a pretrial detainee to make him competent to stand trial. *See id; see also State v. Baker*, 245 Neb. 153, 511 N.W.2d 757 (1994) (holding that a pretrial detainee charged with first-degree murder could be medicated, in part, because he was dangerous).

12. The parties concur with this standard; however, the government indicates that in subsequent appellate proceedings it intends to advocate a reasonableness standard of review; thus, the government argues that its position here should not be construed as a waiver.

given a range of considerations, including its likely side effects and medical ethics implications.

### A. Treatment for Weston's Condition

Antipsychotic medication is the medically acceptable and indicated treatment for Weston's illness. *See* Tr. at 11 (Dr. Johnson); Dr. Daniel's Report at 38; 7/25/00 P.M. Tr. at 10–11 (Dr. DePrato); 7/26/00 P.M. Tr. at 67–68 (Dr. Zonana). While Weston's attorneys do not propose any alternative treatments for Weston's symptoms, they dispute the efficacy of antipsychotic medication. Weston's expert, Dr. Gur, opined that "within a reasonable degree of medical certainty, . . . antipsychotic medication will not restore Mr. Weston's competency." Dr. Gur Ltr. at ¶ 4. Dr. Gur explained the basis for her opinion:

> In light of the length of time (about two decades) that he has experienced delusions, the pervasiveness of his delusional system, lack of treatment, and the unfortunate fact that he has acted on his delusions, make it extremely unlikely that medication will eliminate or substantially attenuate his delusions. There is a growing body of evidence that suggest[s] that when the psychotic process remains untreated it causes further deterioration in brain function resembling an irreversible toxic effect.

*Id.* at ¶ 4.

Dr. Johnson opines that Weston's delusions do not reach back twenty years, at least not in their current form. Rather, "it's only been in the later years, particularly from 1996 to present, that we have seen this full-blown delusional system." 7/8/99 Tr. at 58–59. She testified that the chance Weston will respond positively to the treatment is enhanced because he has had relatively little exposure to antipsychotic medication. *See* 8/20/99 Tr. at 56. Weston already exhibited a receptiveness to treatment with antipsychotic medication in 1996 in Montana. *See* 7/27/00 A.M. Tr. at 121.[13] Specifically, Weston was "calmer, less agitated, less threatening, exhibited some insight that he was ill, less emotionally invested in his delusional material and better able to attend to other matters after treatment." Dr. Daniel's Report at 40. Moreover, approximately seventy to eighty percent of schizophrenics respond positively to medication. *See* 7/24/00 P.M. Tr. at 108.

Dr. Daniel concurs that Weston is likely to benefit from treatment with antipsychotic medication. *See* Dr. Daniel's Report at 34. He notes that nearly all patients with acute psychotic symptoms benefit from antipsychotic medication. *See id.* at 35. Dr. Daniel also opines that Weston will respond favorably to medication, based on his response to treatment in 1996, noting that "[c]linicians generally regard past treatment response as a valuable predictor of future treatment response." *Id.* at 40.

The Court credits Dr. Daniel and the government experts and concludes that an-

---

**13.** The Montana State Hospital, Warm Springs, Montana, medical records provide insight into the effectiveness of treating Weston with antipsychotic medication. Weston's Discharge Summary, signed by three hospital staff members, including one psychiatrist, states: "Russell does notice improvement on his medications. He is aware that his thoughts are more organized and his energy level is less erratic. . . . He does have some persistent delusional beliefs but has more in-sight when medicated and would not become violent and act upon his fears." In addition, the Montana State Hospital Aftercare Plan, signed by a physician, states "Russell remains delusional; however, he appears less compelled to share his belief with others, and when he does, it is with much less emotion and intensity than upon admission. He is currently pleasant and cooperative, and has made no threats toward anyone since he has been stabilized on medications."

tipsychotic medication is the medically appropriate treatment for Weston's condition.

### B. Side Effects of Antipsychotic Medication

The Court must balance the potential efficacy of antipsychotic medication against the likelihood and severity of its potential side effects, which are relevant to Weston's medical interests and trial rights. Here, the Court will focus on Weston's medical interests. The Court will scrutinize the fair trial implications in that section of this Opinion.

The likelihood and severity of possible side effects depend on the type of antipsychotic medication administered. Generally, there are two categories of antipsychotics: (1) typicals, the older generation of antipsychotics, and (2) atypicals, the newer antipsychotics with lower side effect profiles. Currently, atypical antipsychotic medications are not available in injectable form. *See* 7/24/00 P.M. Tr. at 64–66. Dr. Johnson has stated that she would not attempt to treat Weston with atypical antipsychotics, but would start with Haldol, an injectable typical with which the side effect tardive dyskinesia is closely associated. *See id.* at 64–65, 92–94. Dr. Johnson's clinical experience suggests that following the short-term use of an injectable typical antipsychotic on an involuntary basis, the patient generally begins to respond and, ultimately, agrees to take orally atypical medications. *See* 7/24/00 A.M. Tr. at 107. Since Weston may be treated with both types of antipsychotic medication, the Court will analyze the side effects of both.

### 1. Typical Antipsychotics

Typical antipsychotics can produce the following side effects: (1) dystonic or acute dystonic reactions, which involve a stiffening of muscles; (2) acuesthesia, which is restlessness or an inability to sit still; (3) Parkinsonian side effects, which can slow an individual; (4) tardive dyskinesia, which causes repetitive, involuntary tic-like movements of the face, eyelids, and mouth; (5) neuroleptic malignant syndrome ("NMS"), which causes temperature control problems and stiffness; and (6) perioral tremor, referred to as rabbit syndrome because of the mouth movements associated with it. *See* 7/24/00 A.M. Tr. at 109–11; 7/24/00 P.M. Tr. at 6, 101.[14]

The government's witnesses testified that each of these potential side effects is generally manageable and outweighed by the potential benefits of medication. *See* 5/28/99 A.M. Tr. at 19–20; 7/24/00 A.M. Tr. at 105–12 (Dr. Johnson); 7/24/00 P.M. Tr. at 112 (Dr. Johnson); 7/25/00 A.M. Tr. at 40 (Dr. Johnson); 7/25/00 P.M. Tr. at 10–11 (Dr. DePrato). The defense presented little expert testimony regarding side effects, but presented a more negative picture of medication during cross examination and in their pleadings. *See generally* 7/24/00 P.M. Tr. at 91–112 (Dr. Johnson).

Weston's experience with antipsychotic medication is inconclusive. During his commitment in Montana, Weston received antipsychotic medication for about two months during which time he reportedly experienced some improvement and also appeared to suffer some side effects. Weston apparently suffered from restlessness, or acuesthesia, and stiffness, a dystonic reaction. *See* 7/24/00 P.M. Tr. at 5. Nevertheless, Dr. Johnson testified that acuesthesia can be treated with side effect medication, by adjusting the dose of medi-

---

14. Dr. Daniel notes the following potential side effects: 1) motor side effects; 2) cardiovascular side effects; 3) sedation; 4) weight gain; 5) neuroleptic malignant syndrome; 6) hematologic disorders; 7) endocrine disorders; and 8) seizures.

cation, or by changing the type of medication. *See* 7/24/00 P.M. Tr. at 7. In addition, Dr. Johnson stated that while, in its most acute and rare form, an acute dystonic reaction can be fatal, any acute dystonic reactions can quickly be treated using a side-effect medication, and that in her experience, such treatment is almost one hundred percent successful. *See* 7/24/00 P.M. Tr. at 95–97.

The experts also discussed the other possible side effects from typical antipsychotic medication. Parkinsonian side effects can be effectively treated by decreasing the dose or by a variety of other adjunctive medications. *See* 7/24/00 A.M. Tr. at 110–11; 7/24/00 P.M. Tr. at 99. Dr. Johnson testified that tardive dyskinesia and perioral tremor generally occur only after a patient has been treated with high doses of medication over an extended period. *See* 7/24/00 A.M. Tr. at 111; 7/24/00 P.M. Tr. at 101. NMS resembles a severe form of Parkinsonianism with catatonia that develops as an idiosyncratic response. *See* 7/24/00 A.M. Tr. at 111. Without immediate medical attention, ten percent of persons die when NMS develops. *See* 7/24/00 P.M. Tr. at 99. However, Dr. Johnson testified that, should either NMS or tardive dyskinesia develop, the type of medication can be switched or the medication can be stopped. *See* 7/24/00 A.M. Tr. at 111.

### 2. Atypical Antipsychotics

Atypical antipsychotics have a more favorable side effect profile and are better tolerated by the average patient. *See* 7/24/00 P.M. Tr. at 3; 7/24/00 A.M. Tr. at 108. Dr. Zonana testified that atypicals have so few side effects that studies use them on individuals who have not yet been diagnosed with schizophrenia, but who only have symptoms that suggest they might develop the disease. *See* 7/26/00

A.M. Tr. at 39. In short, "there is a world of difference" between the antipsychotic medications described in the judicial opinions of the early 1990s and the current atypical antipsychotic medications now available. 7/26/00 P.M. Tr. at 95 (Dr. Johnson). Despite Dr. Gur's opinion that medication would not be effective, she stated that if Weston were medicated, he should be given atypical antipsychotic medications because they "have better side effect profiles, are better tolerated and are effective on a broader range of symptoms." Dr. Gur Ltr. at ¶ 5.

Dr. Johnson acknowledged that serious side effects may occur with the atypical medications. Agranulocytosis is a severe side effect, associated with clozapine, that may result in death. *See* 7/24/00 P.M. Tr. at 3–4. However, there is a highly effective monitoring system to prevent this result, if clozapine is administered. *See id.* In addition, atypical medications may cause sedation, weight gain, seizures, and problems with lipid metabolism. However, Dr. Johnson stated that, as with the typical antipsychotics, any treatment regimen involving atypical antipsychotics can be carefully monitored so as to "identify a patient who is heading into a problem area and stop the medication or make an adjustment." 7/24/00 P.M. Tr. at 4; *see also* 7/26/00 A.M. Tr. at 61 (Dr. Zonana). Additionally, Dr. Daniel notes that while serious side effects are associated with antipsychotic medications, "the side effects can most often be managed by an alternative course of treatment provided to the benefit of the patient. General experience with antipsychotics, particularly the newer medications, indicates that given their benefits they are reasonably safe and well tolerated." Dr. Daniel's Report at 37.

The Court acknowledges that there is a limited understanding of the side effects of atypical antipsychotics. Weston presented

evidence from Professor Bloche, who did not assess the specifics of antipsychotics, just the implications of their status as a relatively new medical technology.[15] *See* 7/26/00 P.M. Tr. at 37.

### 3. Analysis

The potential side effects of antipsychotic medication are a cause for concern since the atypicals are relatively new and there is little data about their long-term effects and the typicals have many side effects. Nevertheless, the Court must weigh these concerns against the overwhelming evidence that antipsychotic medication is the cornerstone of treating Weston's illness. Dr. Zonana stated that the standard treatment for schizophrenia is antipsychotic medication, and not to treat Weston with such medication would be medically negligent. *See* 7/26/00 A.M. Tr. at 64; *see also* 7/24/00 P.M. Tr. at 11 (Dr. Johnson). Moreover, Drs. Zonana and DePrato testified that they were unaware of any hospital in the country that would not treat Weston with antipsychotic medication. 7/25/00 P.M. Tr. at 11 (Dr. DePrato); 7/25/00 P.M. Tr. at 54–55 (Dr. Zonana).

Certainly, risks and uncertainties are associated with antipsychotic medication. However, the powerful testimony of Dr. Daniel and the government experts persuade the Court that antipsychotic medication is appropriate, notwithstanding the potential side effects since they can be managed with close oversight.

### C. Medical Ethics

Weston's attorneys raise two ethical objections to the proposed treatment. First, they claim that involuntary treatment with antipsychotic medication is not medically appropriate because treating a pre-trial detainee solely to make him competent to stand trial is unethical. Second, they contend that, even if a pretrial detainee may be involuntarily medicated, a treating psychiatrist must take into account the context of the detainee's circumstances in determining what is medically appropriate and that this treatment is unethical in a potential capital case.

### 1. A Psychiatrist Can Treat Solely to Render a Defendant Competent to Stand Trial

■ The first ethical argument posits that a doctor cannot ethically treat a defendant solely to make him competent to stand trial, since such action would make the psychiatrist an agent of the government rather than the patient. The Court is unaware of any legal authority to support this theory. The defense relies on the testimony of Professor Bloche, who relied on the United Nations Principles of Medical Ethics Relevant to the Role of Health Personnel, Particularly Physicians, in the Protection of Prisoners and Detainees against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, U.N.G.A. Res., New York, December 18, 1982, U.N. Doc. A/REX/37/94 ("1982 U.N. Principles"),[16] and the

---

**15.** Professor Bloche testified that new kinds of medical technology, such as antipsychotic drugs, enter the market accompanied by promising reports and become more commonplace in clinical practice. Typically, he stated it is realized only years later-sometimes decades later-that the technology is not as effective as originally anticipated and may have side effects that were not originally appreciated. *See* 7/26/00 P.M. Tr. at 37–39. *But see* 5/28/99 A.M. Tr. at 19–20. However,

he has not studied antipsychotic medications, has not written about antipsychotic medication, has not previously testified as an expert, and claims no "specific and detailed knowledge about the controversy over typical versus atypical antipsychotics." 7/26/00 P.M. Tr. at 14, 17–18, 19.

**16.** The 1982 U.N. Principles were validly promulgated and adopted and have the status of customary international law.

Hippocratic Oath. *See* 7/26/00 P.M. Tr. at 29–30, 31–33. Professor Bloche asserts that these ethical norms govern a psychiatrist's participation in the medication of a pretrial detainee. This argument assumes that no other basis, such as dangerousness, motivates the government's effort to medicate Weston.

The Court is not persuaded that the 1982 U.N. Principles, as interpreted by Professor Bloche, mandate a finding that it would be unethical for a psychiatrist to medicate a pretrial detainee involuntarily to restore competency. The 1982 U.N. Principles state that "[i]t is a contravention of medical ethics for health personnel, particularly psychiatrists, to be involved in any professional relationships with prisoners or detainees the purpose of which is not solely to evaluate, protect, or improve their physical and mental health." 1982 U.N. Principles, U.N. Doc. A/REX/37/94 (Principle 3). Those principles were available to the U.S. medical community when it established its ethical guidelines, which neither sanction nor prohibit involuntary medication for a pretrial detainee. The more recent guidelines and debates among the American Medical Association and other U.S. medical ethical societies have not embraced the argument advanced by the defense. The Court will not create medical ethical prohibitions where the medical community has not imposed such prohibitions. Similarly, the Court does not credit Professor Bloche's interpretation of the Hippocratic Oath, which states, in part, that "into each house I come I will enter only for the good of my patients," over that of numerous licensed medical psychiatrists who testified that medical ethics do not preclude medicating Weston. *See* 7/25/00 P.M. Tr. at 13–14 (Dr. DePrato); 7/25/00 P.M. Tr. at 72 (Dr. Zonana); 7/24/00 P.M. Tr. at 13–14 (Dr. Johnson).

Thus, while the Court concludes that an individual psychiatrist might object to involuntarily treating Weston with medication due to the psychiatrist's own sense of ethics, no established ethical barrier to such treatment exists.

### 2. Involuntary Treatment Could Result in the Death Penalty

The defense maintains that involuntary treatment with medication would be unethical and medically inappropriate in this case because it could potentially begin an unbroken chain of events leading to Weston's execution. This argument assumes Weston will be rendered competent, the government will seek the death penalty, Weston will be convicted and sentenced to death, and will remain competent for trial and execution even if he is later permitted to refuse medication. The defense contends that the treating psychiatrist must assume that permanent remission is possible or, in the alternative, that Weston would continue to be medicated during any post-conviction legal proceedings, and executed. However, Weston's witness, Professor Bloche, conceded that the link between pretrial treatment and execution is "attenuat[ed]." 7/26/00 P.M. Tr. at 55–56.

Nevertheless, the Court is persuaded by the opinions of Drs. Zonana and DePrato, both of whom currently hold positions on medical ethics panels, that medical ethics does not preclude medicating a patient in Weston's situation. *See* 7/25/00 P.M. Tr. at 71–72 (Dr. Zonana); 7/25/00 P.M. Tr. at 13–14 (Dr. DePrato). The controlling medical ethics authorities in this area, codified by the American Medical Association and its Council on Ethical and Judicial Affairs, do not bar treatment of a patient such as Weston. *See* 7/25/00 P.M. Tr. at 59–61. These guidelines distinguish between a convicted defendant and a pretrial detainee. They state that it is unethical to medicate a convicted defendant solely to

render him competent to be executed. *See* 7/25/00 P.M. Tr. at 60 (Dr. Zonana). These guidelines do not extend the same prohibition to a pretrial detainee, even in a potential capital case. *See* 7/25/00 P.M. Tr. at 73 (Dr. Zonana).

Furthermore, the Court rejects the assumption that once medicated Weston will be executed. Safeguards exist at all stages of the proceedings to prevent the unbroken chain from involuntary treatment to execution hypothesized by Weston's attorneys. The Court will be vigilant and available to address whether Weston should be permitted to refuse medication at a later stage of the proceedings. Moreover, the Court is satisfied that no presumption exists that pre-trial involuntary medication will automatically continue post-trial because Weston will be reassessed if his competency is restored. *See* 7/26/00 P.M. Tr. at 87–89 (Dr. Johnson).

### D. Conclusion

The Court holds that antipsychotic medication is the only therapeutic, medically appropriate treatment for Weston's illness, notwithstanding its potential side effects. Further, the Court holds that no established ethical barriers render such treatment medically inappropriate for Weston at this time.

## II. The Government's Interest in Medicating Weston

The Court holds that there are two essential government interests, either of which support medicating Weston: (1) to render him non-dangerous and (2) to render him competent to stand trial.

### A. Dangerousness: The Proposed Treatment is Essential for the Safety of Others

The D.C. Circuit held that "[i]f the government advances the medical/safety justification on remand, it will need to present additional evidence showing that either Weston's condition or his confinement situation has changed since the hearing, so as to render him dangerous." *Weston,* 206 F.3d at 14. The government presented additional evidence and testimony from the following witnesses: (1) Dr. Johnson, Weston's treating psychiatrist and an expert witness; (2) Dr. Landis, Weston's treating psychologist and an expert witness; (3) Drs. DePrato and Zonana, expert witnesses; and (4) Commander Penny Royall, Weston's physical therapist. In addition, Dr. Daniel testified as a Court appointed independent expert. The Court reviewed the original evidence of dangerousness coupled with the new evidence presented. In view of the expanded evidentiary record and the testimony of the medical experts, the Court rejects Weston's attorneys' arguments and holds that the government has proven, by at least clear and convincing evidence, that Weston presents a risk of danger to others.[17]

In 1999, Dr. Johnson testified that Weston was dangerous because he acted on his

---

17. The government has not presented evidence sufficient for the Court to find that Weston's condition has changed to make him more of a danger to himself now than at the time of the Court's September 9, 1999 Opinion. The Court recognizes that Weston is a danger to others, but not necessarily a danger to himself. The government argues that Weston is a danger to himself because, in his current, non-responsive, delusional state, he neither consistently nor fully cooperates with his own physical treatment plan. In fact, Dr. Daniel states that Weston's illness has progressed to the point where Weston is preoccupied and dominated by his delusional system "to the exclusion of almost all aspects to existence beyond vegetative functions." Dr. Daniel's Report at 39. While this is of concern, the Court is unaware of authority suggesting that this sort of passive deterioration supports a finding of dangerousness to one's self.

128

delusions in the past. *See* 7/8/99 Tr. at 51. She also testified that Weston's delusions caused him to place himself in a high-risk situation where the risk of serious injury was great and ultimately realized. *See id.* at 51. Dr. Johnson now states that Weston's delusions have expanded since September 1999. *See* 7/24/00 A.M. Tr. at 92–93. Moreover, she testified that because he incorporates those around him into his delusions, they are at risk of harm. *See id.* at 99.

The government presented persuasive evidence that Weston's deterioration, since this Court's September 9, 1999 Opinion, has resulted in instances of hostility. Weston has not presented any evidence that rebuts the conclusion that his condition has deteriorated. Accordingly, the Court concludes that his condition has further deteriorated since the September 9, 1999 Opinion and that Weston is indeed a danger to others.

Several professionals charged with Weston's care have experienced instances of hostility since the Court's September 9, 1999, Opinion. Commander Royall, Weston's physical therapist, testified that in October 1999, Weston "said something to the effect that, I am Commander of all the armies of the world and you will no longer be able to touch me" when she tried to work with him. 7/24/00 A.M. Tr. at 13. A hostile stare accompanied this comment and caused her to feel frightened and threatened. *See id.* at 20, 37, 42. Commander Royall stated that, in her seven years at FCI–Butner, this was one of the very few times that she had ever felt threatened by a patient. *See id.*

Dr. Landis, the forensic psychologist, stated that he perceived himself to be at risk when Weston accused him, in April 2000, of being a murderer who had killed his wife and raped his children. *See* 7/25/00 A.M. Tr. at 75–76, 90. Weston, in a very loud voice, accused Dr. Landis of murderous conduct and then began progressing toward Dr. Landis until Weston stood right in front of him. *See id.* at 75–76. Dr. Landis was concerned, "[a]s somebody who has spent a great many years with people with serious mental illnesses, this was one of a very limited number of occasions where I considered I'd better think fast." *Id.* at 90. In addition, Dr. Landis testified that an art therapist, who worked with Weston in December 1999, became frightened when Weston jerked away from her and declared that he was a Congressional Medal of Honor winner and that she was not to come within 10 feet of him. *See id.* at 78–79. Dr. Landis also testified regarding Weston's refusal to take an antiblood clot medication and his delusional statement to a nurse that if she forcibly injected him she would be prosecuted and dealt with by NATO. *See id.* at 84.

These incidents of hostility bolster Dr. Johnson's initial conclusion that Weston's delusions cause him to place himself in high-risk situations that could cause him to hurt others. Weston "has been perceived as more menacing ... [j]ust angry and belligerent, not wanting people to come into his room." 7/24/00 A.M. Tr. at 92. Weston's delusions incorporate those who are treating him. These delusions relate to murder, rape, and war. He believes that he is the commander of the armies,

Dr. Johnson also testified that there is an ongoing risk that Weston will commit suicide in his present untreated state. 7/24/00 A.M. Tr. at 99; *see also* 7/25/00 A.M. Tr. at 38 (13% incidence of successful suicides in patients with Weston's symptom picture). In Dr. Daniel's opinion, this risk might be higher for Weston because of Weston's belief that death is not permanent. Dr. Daniel's Report at 41. However, this evidence is essentially the same as the evidence before the Court on September 9, 1999.

that "the people around him, the government, his attorneys, the staff, other unidentified people are doing terrible things, and that he has a mission to stop this regardless of what the consequences are." 7/24/00 A.M. Tr. at 99. He also believes that death is not permanent. *See id.* This sort of delusional thinking is at the heart of his alleged conduct at the U.S. Capitol.

The proposed medication is not to control Weston after he has committed an act of violence; rather, it is to prevent Weston from harming others, in light of the evidence that his mental condition could cause such harm. *Cf. United States v. Horne,* 955 F.Supp. 1141, 1147 (D.Minn. 1997) (holding that "unless the respondent's mental illness is treated, he would pose a danger to prison staff and his fellow inmates if he is removed from segregation"). As Dr. Daniel noted "[u]nmedicated and in the general population, [Weston] would be at an extremely high risk of inflicting violence on other inmates, staff members, or visitors who might become incorporated into his delusional system. The timing of such potential violence could be very hard to predict." Dr. Daniel's Report at 34.

It is uncontroverted that Weston has not struck or physically injured anyone while incarcerated at FCI–Butner. However, a finding of dangerousness does not require such acts. *See, e.g., United States v. Husar,* 859 F.2d 1494, 1498 (D.C.Cir.1988) (finding that the district court did not err in holding that defendant should not be released because the smashing of a glass case, which led to his arrest and confinement, sufficiently indicated his dangerousness); *United States v. Muhammad,* 165 F.3d 327, 336 (5th Cir.1999) (finding defendant dangerous because "whatever physi-

cal or medical problems she had or might have in the future would go undetected or undiagnosed" due to her "refusal to have medical treatment"), *cert. denied,* 526 U.S. 1138, 119 S.Ct. 1795, 143 L.Ed.2d 1022 (1999); *United States v. S.A.,* 129 F.3d 995, 1001 (8th Cir.1997) (defendant found dangerous despite no overt acts of violence because "[defendant] has spent most of his time at FMC–Rochester in isolation and has therefore had minimal contact with others and, consequently, minimal opportunity to engage in violent behavior"); *United States v. Ecker,* 30 F.3d 966, 970 (8th Cir.1994) ("[o]vert acts of violence, however, are not required to prove dangerousness"); *United States v. Steil,* 916 F.2d 485, 488 (8th Cir.1990) (finding appellant should be committed based on testimony from five mental health professionals that he was mentally ill and dangerous). The potential for immediate harm exists because Weston's illness remains untreated.

Nor is Weston's dangerousness necessarily belied by his occasional cooperation with staff members. As Dr. Johnson stated, it is the unpredictability of Weston's actions that makes him dangerous. She indicated that often schizophrenic behavior has no warning signs; schizophrenics "could appear very calm and turn around and assault someone or kill someone." 7/25/00 A.M. Tr. at 7. Dr. Landis also stated that "[p]eople with schizophrenia can behave erratically .... [C]ertainly one of the things that's characteristic in Mr. Weston's case is very sporadically you have these surprise incidents." *Id.* at 104.

Numerous medical experts, including Drs. Daniel, DePrato, and Zonana, also persuade the Court that Weston is dangerous.[18] Dr. Daniel's report explains that in

---

**18.** Drs. DePrato and Zonana based their opinions on the testimony and conclusions

reached by other experts. Nevertheless, the Court concludes that their opinions, as well as

assessing dangerousness, he looks to: (1) the individual's past violent behavior; (2) the individual's underlying condition; and (3) the individual's lack of expression of regret for past violent behavior. Dr. Daniel's Report at 32–34. Weston's past violent behavior includes an October 15, 1996 assault on a staff member at Montana State Hospital, the July 24, 1998 incident at the U.S. Capitol, and the previously discussed incidents of hostility at FCI–Butner. Dr. Daniel stated that Weston's underlying condition, paranoid schizophrenia, is the etiology of the paranoid delusions that caused Weston's past acts of violence, and continue to make Weston dangerous. Dr. Daniel stated that "the delusional material the patient has expressed indicates that he believes that death for himself and others is not permanent. Thus, the consequences of suicide or homicide are substantially reduced in his belief system and the attendant risk of violence is heightened." *Id.* at 33. Finally, Dr. Daniel stated that Weston is not documented to have expressed regret for his past violent behavior or shown insight into the delusional basis of his past violent behavior which increases the chance Weston could repeat similar acts. Dr. Daniel's Report at 34.

The Court has reviewed possible alternatives to antipsychotic medication that may be less intrusive and found them inadequate for treating and controlling Weston's dangerousness. Dr. Johnson testified that she has considered at length and rejected alternative treatment interventions, such as individual psychotherapy and group therapy, because they would not have any impact on Weston's mental illness. *See* 7/8/99 Tr. at 55–56. Dr. Johnson expressed the same opinion at the July 2000 hearing, testifying that alternatives such as verbal therapy, recreation therapy, antidepressants, anti-anxiety medication, or sedatives, were either ineffective or not indicated for Weston in his current condition. *See* 7/24/00 A.M. Tr. at 98–99.

To mitigate Weston's dangerousness, he is currently housed in FCI–Butner's Seclusion Admission Unit and is under twenty-four hour observation by a guard posted outside his room. Nevertheless, staff must enter his room to check on him and tend to his basic needs. *See* 7/25/00 A.M. Tr. at 69–70. As Dr. Landis stated, "there is no way to avoid him from having contact with the nurses, the officers on a daily basis, and with Dr. Johnson and I on a somewhat less frequent basis" 7/25/00 A.M. Tr. at 71. In Dr. Johnson's opinion, Weston "presents an immediate risk of harm to people who are entering his room." 7/24/00 A.M. Tr. at 91. At the onset, the Court notes that Weston does not have a due process right to seclusion. *See Horne,* 955 F.Supp. at 1148–1149 (holding that "prisoners do not have a due process right to remain in isolation or segregation to avoid a particular form of treatment, such as the forcible administration of psychotropic medications"); *see also United States v. Watson,* 893 F.2d 970, 982 (8th Cir.1990) (doubting that segregated confinement constituted a less restrictive alternative to drug treatment of a prisoner.)

Seclusion is simply the warehousing of Weston in a psychotic state. *See* 7/24/00 A.M. Tr. at 100. It is not treatment;[19] at

those of Drs. Johnson, Daniel, and Landis, are sound, based on sufficient education and experience, and are not outweighed by other evidence.

19. "The accrediting organizations in the country, particularly the Joint Commission for Accreditation of Health Care Facilities, [are] increasingly placing more stringent standards on the use of seclusion, because of the

best it contains dangerousness. *See* 7/24/00 A.M. Tr. at 100; 7/25/00 P.M. Tr. at 13. In fact, seclusion could be the cause of further deterioration of Weston, as indicated by the new evidence. *See* 7/24/00 A.M. Tr. at 101; 7/25/00 P.M. Tr. at 13. Dr. Daniel indicated that seclusion "has the potential to interact with and worsen core "negative" symptoms of schizophrenia, including autistic tendencies, social isolation, egocentricity, passive social withdrawal, and general social impairment." Dr. Daniel's Report at 38. The medical experts also stressed that seclusion is typically viewed as a short-term, last resort, rather than an acceptable long-term strategy to cope with dangerousness. *See* 7/24/00 A.M. Tr. at 59–60, 100–03; 7/25/00 A.M. Tr. at 104–05.

Further, it is Weston's dangerousness that mandates his seclusion and twenty-four-hour observation. *See* 7/24/00 P.M. Tr. at 12 (Dr. Johnson stating that the "first issue with Mr. Weston is to get his psychotic symptoms under control and decrease his dangerousness. That is the factor that is placing the restrictions on his housing situation at this particular point in time."). According to Dr. Daniel, Weston's current conditions of confinement "cannot be inferred to indicate that he is not acutely dangerous, only that he is prevented from carrying out dangerous activity." Dr. Daniel's Report at 34. Since seclusion has no therapeutic effect, it does not address the government's interest in treating Weston's illness.

Also, the doctors and the BOP employees entrusted with his care and treatment clearly do not perceive seclusion as a legitimate, ongoing response to dangerousness. *See, e.g.,* 7/24/00 A.M. Tr. at 60, 100; 7/25/00 P.M. Tr. at 13, 17–18. The government presented testimony, in addition to that of the medical experts, that the ex-

treme measures taken by FCI–Butner personnel, seclusion coupled with twenty-four hour observation, are not an administratively feasible long-term solution to Weston's present dangerousness. First, Assistant Director Phillip Steven Wise of the BOP's Health Services testified that seclusion beds are designed only for short-term use, "to stabilize, to assess, and then put an inmate or individual back in a more normal sort of setting." 7/24/00 A.M. Tr. at 60. Second, seclusion beds are a limited, finite resource and continuing to house Weston in seclusion is straining the BOP's resources. *See* 7/24/00 A.M. Tr. at 62; *Harper,* 494 U.S. at 227, 110 S.Ct. 1028 (holding that respondent "failed to demonstrate that ... seclusion [is an] acceptable substitute[ ] for antipsychotic drugs, in terms of either their medical effectiveness or their toll on limited prison resources"). The long-term use of seclusion beds by patients like Weston would be very troubling according to Assistant Director Wise. *See* 7/24/00 A.M. Tr. at 62. These concerns undermine the usefulness of seclusion as a means to treat dangerousness. The courts in *Watson* and *Horne* considered these factors important in determining whether to use isolation instead of drug treatment to address dangerousness. *See Watson,* 893 F.2d at 982; *Horne,* 955 F.Supp. at 1149.

In conclusion, the Court is persuaded that the government has presented additional factual evidence, as well as expert testimony, to support a conclusion that Weston is a danger to those around him. Having considered the alternatives to antipsychotic medication, the Court holds that antipsychotic medication is essential to control and treat Weston's dangerousness to others. In view of the foregoing, the Court holds that Weston poses a danger to

negative consequences it has to an individual." 7/24/00 A.M. Tr. at 102.

others, that medication would significantly diminish his dangerousness, and that no less intrusive means exist to ensure the safety of those around him.

### B. Trial Competency: The Government Cannot Obtain an Adjudication of Weston's Guilt or Innocence with Less Intrusive Means

The government has an essential interest in bringing Weston to trial. *See Illinois v. Allen*, 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring) ("[c]onstitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace"); *Winston v. Lee*, 470 U.S. 753, 762, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) ("the community's interest in fairly and accurately determining guilt or innocence . . . is of course of great importance"); *Brandon*, 158 F.3d at 954 ("government's interest in bringing a defendant to trial is substantial"); *Khiem v. United States*, 612 A.2d 160, 167 (D.C. 1992) ("government's interest [in bringing a murder defendant to trial] is a 'fundamental' one and of a very high order indeed").

It does not follow, however, that the government has an essential interest in prosecuting every alleged crime so as to justify involuntary medication in all cases. *See Brandon*, 158 F.3d at 961; *Woodland v. Angus*, 820 F.Supp. 1497, 1513 (1993) (stating that "the State's interest is not in trying plaintiff under any circumstances, but in trying plaintiff fairly and accurately"). Nor is the Court articulating a bright line test for determining which crimes trigger an essential interest in bringing a defendant to trial. However, the Court is persuaded that the facts of this particular case give rise to such an essential interest given the serious and violent nature of the charges, that the immediate victims were federal law enforcement officers performing their official duties, and that the killings took place inside the U.S. Capitol amid a crowd of innocent bystanders. This case is unlike *Brandon* where the defendant was charged with sending a threatening letter through the mail, a crime carrying only a five-year penalty.

Involuntary medication is the least intrusive means to meet this essential government interest because, as previously discussed, antipsychotic medication is the only therapeutic intervention available that could possibly improve Weston's symptom picture, lessen his delusions, and make him competent to stand trial. Although, it is not certain that the medication will restore Weston's competency, the Court credits the previously discussed testimony of the mental health experts that this outcome is likely. *See Woodland*, 820 F.Supp. at 1512 (stating that where the state seeks to medicate a pretrial detainee involuntarily to render him competent to stand trial, the state need not guarantee that the medication will achieve that purpose but "there must be at least a showing that such a course of action can reasonably be expected to in fact render the defendant competent").

### III. *Weston's Trial Rights*

Although the government's interests in treating Weston's dangerousness and restoring his competency are essential and antipsychotic medication is the least intrusive means to meet these interests, the Court must still balance those interests against Weston's trial rights. Involuntary antipsychotic medication has the potential to adversely affect Weston's ability to obtain a fair trial. *See Weston*, 206 F.3d at 14; *Brandon*, 158 F.3d at 954. Accordingly, before allowing the government to medicate Weston, the Court must consider the

potential impact of medication on his fair trial rights.

The Court has carefully analyzed whether the government's pursuit of its interests will impair Weston's following Fifth and Sixth Amendment rights: (1) the right not to be tried unless competent to "consult with counsel and assist in his defense," *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); (2) the right to testify and to "present his own version of events in his own words," *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); (3) the right to be present in the courtroom at every stage of the trial, *see Allen*, 397 U.S. at 338, 90 S.Ct. 1057; and (4) the right to present a defense, including an insanity defense, *see* 18 U.S.C. § 17 (setting forth requirements for insanity defense).

### A. Weston's Right to Consult with Counsel and Assist in his Defense

Ironically, a strong likelihood exists that medication will enhance some of Weston's trial rights, particularly his right to consult with counsel and to assist in his defense. Currently, Weston is either unable or unwilling to speak with his attorneys. *See* 7/24/00 A.M. Tr. at 87–89. The evidence suggests that he may not believe that his attorneys are actually representing him. Dr. Johnson testified that "[h]e has all along had an intermittent belief that he has other attorneys from the past, famous attorneys who are involved in his case and who continue to have an interest in his case." *Id.* at 89. Indeed, while Weston appeared somewhat attentive during the July 2000 hearing, Dr. Johnson testified that Weston was not able to follow and process what happens in court or while at FCI–Butner. *See* 7/24/00 A.M. Tr. at 89–90.

Successful treatment with antipsychotic medication will probably decrease Weston's delusional thinking and increase his attention and ability to concentrate. *See* 7/25/00 A.M. Tr. at 24. Medication, therefore, has the potential of greatly enhancing Weston's ability to communicate meaningfully with his attorneys. Medication should also enhance Weston's ability to understand and follow the testimony at trial.

### B. Weston's Right to Testify

Medication might alter the content of Weston's testimony and interfere with his ability to testify. For instance, Dr. Johnson testified that antipsychotic medication might cause Weston to filter out events that might be too disturbing for him to cope with or to recount events as one would recount a dream. *See* 7/25/00 A.M. Tr. at 4–5. Antipsychotic medication may also adversely affect Weston's memory, although Dr. Johnson discounted this possibility. *See* 7/24/00 P.M. Tr. at 50–51; 7/25/00 A.M. Tr. at 4–5. Further, a jury listening to a non-delusional Weston explain his delusional beliefs may be more skeptical than a jury listening to a delusional, unmedicated Weston. In such circumstances, the jury might find it hard to believe that a person with an appropriate affect did not understand the nature and wrongfulness of his behavior at the time of the charged conduct. *See Weston*, 206 F.3d at 21 (Tatel, concurring).

The potential prejudice to Weston regarding his demeanor and potential testimony at trial is of concern to the Court because his ability to present his version of the facts is a critical one. *See Commonwealth v. Louraine*, 390 Mass. 28, 453 N.E.2d 437, 442 (1983). Moreover, if Weston's sanity is at issue, the jury is entitled to consider Weston's demeanor in court. *See id.* Nevertheless, even on this vital question of courtroom demeanor and testimonial rights, courts have not regarded a

defendant's right to refuse medication as absolute. Rather, courts have scrutinized the particulars of a case and taken measures to mitigate the prejudice. For instance, courts have analyzed the distinction between sedatives, that can dull thought processes, and antipsychotics that should restore or improve cognitive function by a mentally ill defendant. *See, e.g., People v. Hardesty,* 139 Mich.App. 124, 362 N.W.2d 787, 797 (1984) ("since it was a matter of speculation how nearly defendant in an undrugged state of mind at trial would reflect his mental state at the time of the offenses, we believe that informing the jury of his drugged condition adequately protected his right to testify"); *State v. Law,* 270 S.C. 664, 244 S.E.2d 302, 306 (1978) ("[T]here is nothing to indicate the medications undermined the appellant's sanity defense. There was much testimony given before the jury regarding the medications and their effect. The jury was well aware of the appellant's mental history and present condition and knew that the appellant's remissive state and calm demeanor at trial were the result of medication.").

The defendant's right to appear before the jury in an unmedicated state may depend upon how closely that state approximates his demeanor at the time of the charged offense. *Cf. State v. Hayes,* 118 N.H. 458, 389 A.2d 1379, 1381–82 (1978). Weston was not taking medication at the time of the charged offense and has deteriorated significantly over the intervening two years. With or without medication, Weston would not appear at trial in the same condition as at the time of the incidents at the U.S. Capitol.[20] Therefore, Weston's right to appear before the jury in an unmedicated state is less absolute than

it might be were his current condition like his condition at the time of the alleged offense.

The Court recognizes the cautionary statement in *Riggins* that "[e]ven if ... the Nevada Supreme Court was right that expert testimony allowed jurors to assess Riggins' demeanor fairly, an unacceptable risk of prejudice remained." *Riggins,* 504 U.S. at 138, 112 S.Ct. 1810. However, the Court must evaluate the language in concert with the statements in *Riggins* that an essential government interest can sometimes justify trial prejudice. *See Riggins,* 504 U.S. at 138, 112 S.Ct. 1810 (citing *Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)).

### C. Weston's Demeanor and Appearance

As indicated, antipsychotic medication raises concerns regarding its possible effect on Weston's demeanor and appearance in front of the jury. Side effects of the medication may alter Weston's reactions in the courtroom, cause uncontrollable movements, or create other changes in behavior that may prejudice Weston. *See Riggins,* 504 U.S. at 141–43, 112 S.Ct. 1810 (Kennedy, J., concurring). Advances in the primary antipsychotic medications and adjunct therapies make such side effects less likely. *See* 5/28/99 A.M. Tr. at 19–20; 7/24/00 A.M. Tr. at 105–06. Additionally, medications that help control side effects are available and Weston will be very closely monitored. In fact, antipsychotic medication is likely to make Weston's affect more, rather than less, appropriate. *See* 7/26/00 A.M. Tr. at 62–63 (Dr. Zonana); 7/25/00 A.M. Tr. at 4, 23–24 (Dr. Johnson).

---

**20.** Indeed, it appears that Weston is currently unwilling or unable to discuss his delusions, although he did so freely in the period immediately following his arrest. *See* 5/28/99 A.M. Tr. at 21–22.

### D. Weston's Right to Present a Defense, Including an Insanity Defense

Judge Tatel stated in his concurring opinion that "[r]endering Weston nondelusional may impair his ability to mount an effective insanity defense. . . . Were Weston's testimony the only way for him to present an insanity defense, I would thus have serious doubts about whether the government could involuntarily medicate him." 206 F.3d at 21 (Tatel, J., concurring). Judge Tatel went on to suggest that Weston's testimony may not be the only way to present an insanity defense and directed this Court to "review the tapes to determine whether they show Weston in his delusional state, and if so, whether, combined with psychiatric testimony, they would enable defense counsel to mount an effective insanity defense." *Id.*[21]

Considerable evidence documents the extent and nature of Weston's delusions. At the July 2000 hearing, Weston's attorneys cross-examined Dr. Johnson at length about Weston's delusional system, including those delusions that motivated him to go to the U.S. Capitol on July 24, 1998. *See* 7/24/00 P.M. Tr. at 16–48. Further, videotaped interviews with defense expert, Dr. Phillip Resnick, document this delusional system.[22] Dr. Resnick interviewed Weston at least six times over approximately twelve hours. Also, one defense expert, Dr. Seymour Halleck, interviewed Weston shortly after the shootings in the presence of a government expert, Dr. Robert Phillips. The tapes and psychiatric reports reviewed by the Court document Weston's delusional state over several years.[23] However, the tapes do not necessarily focus on the particulars of the alleged offense or the precise details of how Weston's delusions relate to his alleged actions on July 24, 1998.

Neither the government nor the Court requested that Dr. Johnson or Dr. Daniel render an opinion about Weston's sanity. However, their reports, which are incorporated herein as if set forth *seriatem*, are replete with evidence of the following: Weston's mental condition, hospitalizations, and treatment before and after the time of the offenses charged, as well as

21. The Court pursued this issue in open court with counsel for both parties and in sealed proceedings with Weston's attorneys only. Suffice it to say, without violating the confidentiality of the sealed conversation with Weston's attorneys, they took the position that it was not Weston's burden to present evidence on this issue. Further, they maintained that they had no authorization from their client to present any evidence on this issue. The government also claimed that it was not its burden to present evidence on this issue and, likewise, presented no additional evidence on this issue. In view of the unusual posture of this case, pre-arraignment, the federal rules allowing a party to obtain discovery of this type of evidence from a party opponent do not enable the Court to order either side to produce relevant evidence at this time on the issue of insanity. In the event Weston is ever arraigned, however, and serves a Fed. R.Crim.P. 12.2 notice, the parties can exchange discovery on this issue and the Court can order a responsibility assessment pursuant to 18 U.S.C. § 4242(a).

22. Even predating the alleged offenses, the Central Intelligence Agency taped an extensive interview with Weston in which he discussed his delusional beliefs at length. *See* 7/24/00 P.M. Tr. at 26–27. *See generally* 7/26/00 P.M. Tr. at 28–36.

23. The videotapes reviewed by the Court include: 1) an interview between Dr. Phillip Resnick and Weston at Central Treatment Facility on January 31, 1999; 2) an interview between Dr. Phillip Resnick and Weston at Central Treatment Facility on March 27, 1999; 3) an interview of Weston conducted at the Central Intelligence Agency's headquarters in 1996; and 4) a Christmas dinner and gift exchange with Weston and his family in 1997.

evidence of his mental condition at the time of the offense; the deterioration of his mental condition over many years and the knowledge of such deterioration by his family members, friends, and mental health professionals; the relative stabilization of his assaultive and threatening behavior when medicated; that he had not been taking medication for many years preceding his arrest; and that he had a long history of prior hospitalizations and treatment for his mental problems.

Moreover, the reports identify numerous lay witnesses, including family members, who could testify about Weston's behavior, appearance, speech, actions, and extraordinary or bizarre acts by him over a significant period. Also, according to Weston's attorneys, material released by the government on the eve of the competency hearing, pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), identifies witnesses who observed Weston while he appeared delusional and acting bizarre. At this preliminary stage of the proceedings, and mindful that Weston has never been arraigned, it is the Court's preliminary opinion that the tapes, when combined with psychiatric and lay testimony may allow Weston to mount an effective insanity defense, which would entitle him to an instruction on this issue.[24] *See* 18 U.S.C. § 17(b).

The restoration of Weston's competency could trigger the production of additional relevant evidence from which the Court could supplement its findings on this issue. For instance, if Weston is arraigned, he will then have the opportunity to file a notice, pursuant to Fed.R.Crim.P. 12.2, that he intends to rely on the defense of insanity and that he intends to introduce expert testimony relating to a mental disease or defect or any other mental condition bearing on the issue of guilt. Upon the filing of such notice and motion by the government, the Court would order a psychiatric or psychological examination of Weston and that a report be filed with the Court pursuant to 18 U.S.C. § 4242(a). Further, discovery by Weston and the government of additional mental health evidence would occur pursuant to Fed. R.Crim.P. 16. Thus, if Weston regains competency and wishes to assert an insanity defense, there may be additional evidence regarding this issue.

### E.  Summary

There are many uncertainties regarding the effects that medication will have on Weston's demeanor and thought processes because the reaction to medication is unique to each patient. However, the Court rejects Weston's attorneys' contention that this uncertainty precludes the use of medication in this context at this time. To interpret "clear and convincing" evidence as the defense suggests would effectively preclude involuntary medication in every case, since the government could never establish that a given individual would respond in a predictable manner, no matter how high the statistical probabilities.

It is difficult for the Court to determine at this point whether unacceptable trial prejudice would result from the medi-

---

24. Indeed, courts "have generally taken a liberal approach to the admissibility of evidence in support or contradiction of the affirmative defense of insanity." *United States v. Rezaq,* 918 F.Supp. 463, 466 (D.D.C.1996); *see also United States v. Brawner,* 471 F.2d 969, 994– 95 (D.C.Cir.1972); *United States v. Alexander,* 805 F.2d 1458, 1464 (11th Cir.1986) (noting that a court "should be liberal in admitting testimony (and evidence) regarding the issue of insanity"); *United States v. Samuels,* 801 F.2d 1052, 1056 (8th Cir.1986); *United States v. McRary,* 616 F.2d 181, 184 (5th Cir.1980); *United States v. Ives,* 609 F.2d 930, 932–33 (9th Cir.1979); *United States v. Smith,* 507 F.2d 710, 711 (4th Cir.1974).

cation. Nor is it essential that the Court attempt to resolve all these uncertainties at this stage of the proceedings. *See Weston,* 206 F.3d at 21 (Tatel, J., concurring) (stating that he "see[s] no reason why the potential for side effects would preclude the district court from ordering medication, provided that, should Weston become competent to stand trial, the district court conducts a second hearing to determine the extent to which any side effects Weston is actually experiencing might affect his fair trial rights"); *see also Morgan,* 193 F.3d. at 264–65 ("further procedural protection" available post-treatment to assess impact of medication of defendant's fair trial rights).

As Judge Tatel recognized, " 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.' " *Weston,* 206 F.3d at 22 (Tatel, J., concurring) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Thus, the correct inquiry at this stage is whether Weston could receive a fair trial, notwithstanding the potential prejudice. There is no reason to conclude, at this time, that involuntary medication would preclude Weston from receiving a fair trial. First, should the medication significantly alter Weston's demeanor or memory, there is substantial extant information concerning his past and present delusions that would aid the Court in reassessing the impact involuntary treatment might have on Weston's fair trial rights and aid him in presenting an insanity defense. Second, the Court credits the testimony of the government experts and Dr. Daniel, the independent expert, that the side effects of medication are manageable through adjustments in the timing and amount of the dose, and through supplementary medications. Third, Weston has no absolute right to present himself as he was on the day of the alleged crime, nor could he, with or without medication. As the government correctly notes, Weston is already in a significantly different mental condition compared with the day of his arrest.

The Court will reassess, upon request, its determination regarding the prejudice to Weston's fair trial rights resulting from medication when testimony about the actual, not hypothetical, impact of the medication is available. The Court is confident that any such review will not come too late to prevent impairment of Weston's rights. However, since Weston's reaction to the medication is, at this point, unknown, by proceeding to medicate him, the government risks the possibility of forfeiting its right to bring Weston to trial. Nevertheless, the Court is reasonably confident, based on the persuasive expert testimony, that any prejudice that might arise would occur with ample time for the Court to revisit these issues.

If Weston is medicated and his competency is restored, the Court is willing to take whatever reasonable measures are necessary to ensure that his rights are protected. This may include informing the jurors that Weston is being administered mind-altering medication, that his behavior in their presence is conditioned on drugs being administered to him at the request of the government, and allowing experts and others to testify regarding Weston's unmedicated condition, the effects of the medication on Weston, and the necessity of medication to render Weston competent to stand trial.

Moreover, Weston's treatment with antipsychotic medication will be closely monitored. First, pursuant to the administrative regulations governing the use of involuntary treatment and the accreditation requirements of the Joint Commission on Accreditation of Health Care Organizations, every 30 days Weston's medication treatment plan will be

reviewed by a non-treating psychiatrist. *See* 7/26/00 P.M. Tr. at 90–91. These 30–day reviews will focus on: (1) the onset, if any, of side effects; (2) any medical problems that may develop; (3) the psychiatrist's use of appropriate lab analyses, such as eye examinations, and liver enzyme tests; and (4) the appropriateness of current dosages. See 7/26/00 P.M. Tr. at 91–92. Weston "can ask the hearing officer for an in-person review at any time instead of the 30–day review." 7/26/00 P.M. Tr. *at* 94. Second, every week at FCI–Butner, a non-treating doctor reviews the medications of all patients in the hospital with an eye toward ferreting out anything unusual and monitoring compliance. *See* 7/26/00 P.M. Tr. at 92. Third, apart from the psychiatrists, pharmacy personnel review dosages and medication combinations on a monthly basis. *See* 7/26/00 P.M. Tr. at 93. Fourth, a report on Weston's treatment shall be provided to the Court every month and the Court is reserving the option of having each report reviewed by an independent expert. *See* 7/26/00 P.M. Tr. *at 93*. Fifth, Weston's attorneys and family can independently monitor him upon request to the Court. *See* 7/26/00 P.M. Tr. at 94.

### CONCLUSION

The Court has found by at least clear and convincing evidence that antipsychotic medication is medically appropriate. Further, considering less intrusive alternatives, antipsychotic medication is essential to prevent Weston from harming others and restore his competency and to bring him to trial. The Court has carefully scrutinized the likely impact of the medication on Weston's fair trial rights and, at this stage, is persuaded that Weston can be medicated without impermissibly infringing on his ability to receive a fair trial. The Court will conduct subsequent eviden-

tiary hearings, as appropriate, to consider the actual effects of the medication on Weston and the related implications on his trial rights.

Accordingly, for the reasons articulated, it is hereby

**ORDERED** that the Bureau of Prisons is authorized to treat the defendant, Russell Eugene Weston, Jr., involuntarily with antipsychotic medication. The Court will **STAY** this ruling until **March 19, 2001**, at **5:00 P.M.** to enable Weston to file a Notice of Appeal, and thereafter to seek a further stay of the Court's ruling from the United States Court of Appeals; and it is

**FURTHER ORDERED** that the Bureau of Prisons provide the Court and the parties with a report regarding Weston's treatment every thirty days; and it is

**FURTHER ORDERED** that the Bureau of Prisons bifurcate the roles of forensic evaluator and treating psychiatrist in this case.

**IT IS SO ORDERED.**